STEWART et al. v. ONEAL (two cases).

CARY et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. December 5, 1916. On Petition for Rehearing, January 17, 1917.)

Nos. 2812, 2823, 2868.

1. JUDGMENT ⚙️677—PERSONS BOUND—UNBORN REMAINDERMEN.
   A decree vacating probate of and holding void a will is, under the doctrine of virtual representation, binding on a remainderman born after the time limited for contest of the will, there being before the court parties whose interests were identical with his; that is, to uphold the will.
   [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1062, 1193; Dec. Dig. ⚙️677.]

2. WILLS ⚙️398—VACATION OF PROBATE—APPEAL—EFFECT—TRIAL DE NOVO.
   Mere appeal from a decree vacating probate of a will did not have the effect of vacating the decree, merely because the trial in the Supreme Court was de novo.
   [Ed. Note.—For other cases, see Wills, Dec. Dig. ⚙️398.]

3. APPEAL AND ERROR ⚙️437—EFFECT—"SUSPENDED"—"VACATED."
   Under Act March 8, 1831 (29 Ohio Laws, p. 79), § 112, providing that decree of the court of common pleas should be suspended by appeal therefrom, it was not vacated by the appeal—"vacate" meaning to annul, set aside, or render void; "suspend," to stay.
   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2193–2195; Dec. Dig. ⚙️437.
   For other definitions, see Words and Phrases, First and Second Series, Suspend; Vacate.]

4. APPEAL AND ERROR ⚙️803—DISMISSAL—EFFECT.
   Appeal having only suspended the decree vacating probate of a will, dismissal of the appeal could not have the effect of vacating the decree and leaving the will in force; and this as to an unborn remainderman, though the dismissal was pursuant to a settlement out of court, making no provision for him, he, at most, having only right to have the dismissal set aside by the court which ordered it.
   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3169–3173; Dec. Dig. ⚙️803.]

On Rehearing.

5. APPEAL AND ERROR ⚙️803—EFFECT OF DISMISSAL OF APPEAL.
   The dismissal of an appeal, although wrongful, does not vacate the decree appealed from.
   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3169–3173; Dec. Dig. ⚙️803.]

Appeals from the District Court of the United States for the Southern District of Ohio; Howard C. Hollister, Judge.

Suit by Robert H. Oneal against Julia G. Stewart and others. From decree for complainant, three appeals are taken; one by the named defendant and others, one by defendant Samuel F. Cary and others, and one by all the defendants. Reversed, with directions.

O. W. Kuhn, W. A. Hicks, Cohen, Mack & Hurtig, Ben. B. Hale, and C. W. Baker, all of Cincinnati, Ohio, for appellants.
J. C. Healy, of Cincinnati, Ohio, for appellee.

⚙️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
237 F.—57

Before KNAPPEN and DENISON, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. These three appeals are taken from the decree of the lower court in favor of the appellee, in a suit brought by him against all the appellants, seeking to establish his ownership of two separate parcels of real estate in the city of Cincinnati, Ohio, one possessed and claimed by the appellants in No. 2812, and the other by the appellants in No. 2823. The question as to the ownership thereof is exactly the same as to each parcel, and appellee, therefore, sued the appellants jointly. They have appealed separately and jointly. Hence the three appeals.

The appellee claims the two parcels under a document purporting to have been the will of Elmor Williams, who died February 9, 1843, executed November 28, 1842, and probated as his will February 14, 1843. He left a large estate. It was principally real estate, worth $250,000, and consisted, mainly, of town lots, mostly improved, in the city of Cincinnati, Ohio. Besides these there was some acreage property in Hamilton county, in which that city is located. The town lots, with slight exceptions, were in the heart of the city. Amongst them was the important block, bounded by Fifth, Vine, and Sixth streets, and Lodge Alley. He left surviving him his wife, Lucy Ann Williams, and, as his only heirs at law, three children of a deceased daughter, Martha Allen, viz. William E. Allen, Rebecca A. Allen, and Maria L. Cary, wife of Samuel L. Cary, all of age; two children of a deceased daughter, Rebecca Gazlay, viz. William E. Gazlay and Allen W. Gazlay, aged, respectively, 19 and 14; and a son, Charles E. Williams, aged 14. By the document numerous devises and bequests were made. These were not confined to the natural objects of his bounty, to wit, his wife and descendants. They included collateral kindred, and, apparently, others not connected with him either by blood or marriage. Apparently, also, amongst his descendants, his son was decidedly favored. The children of Rebecca Gazlay fared better than those of Martha Allen, and a nephew, Ephraim D. Williams, and his seven children, and one William P. Hulbert, apparently not so connected, fared as well, if not better, than either set of grandchildren. It contemplated that his wife might renounce the provisions in her behalf, and referred to her act, in case she did so, as a "defiance" of his will. There were over 50 different parcels of real estate devised by over 20 separate devises. In the block referred to there were 14 parcels, and of these 11 separate devises were made. All of the devises, with a few exceptions, were of like character. They were of a life estate, with a contingent remainder with a double aspect; i. e., to the first taker for life, remainder to the children of his or her body begotten, and, if no such child, to another. The document indicated marked antipathy toward his son-in-law, James W. Gazlay, and to a certain other individual unconnected with him. The devises to the children of the former were on the express condition that he should have nothing to do therewith, directly or indirectly, and the latter, characterized as "a dangerous man, cannot be trusted in safety," was forbidden to have the guard-

ianship of his son, or to have anything to do, directly or indirectly, with the settlement of his estate or management of any of the devises or bequests thereby made. His nephew, Ephraim D. Williams, and William P. Hulbert were appointed executors.

The two parcels claimed by the appellee were in the block referred to, one on Vine and the other on Fifth streets. The Vine street parcel was devised as follows, to wit:

"To Sarah M. Floyd, the daughter· of my sister, Martha Spader, * * * for and during the life of Sarah Floyd, and at her decease * * * to Charlotte C. Williams, the daughter of Miles Williams, and at her decease * * * to the children of her body begotten forever."

The Fifth street parcel was devised as follows, to wit:

"To my wife, Lucy Ann Williams, * * * to have and to hold during her life, provided she claims under my will, and at her decease * * * to Charlotte C. Williams, the daughter of my nephew, Miles Williams, and at her decease to the children of her body begotten forever."

By a subsequent clause it was provided that, "in case Charlotte C. Williams should decease without leaving a child," her estate was to go "to her father, Miles Williams, forever." Charlotte C. Williams was born February 22, 1840, and hence was, at the time of the probate, almost 4 years old. She married John H. Oneal November 22, 1880. There was born to them, July 24, 1883, the appellee, Robert H. Oneal, and he was the only child "of her body begotten." She ·died February 24, 1904. The first two life tenants, Sarah M. Floyd and Lucy Ann Williams, died long before Charlotte C. Williams. Thus it is that the appellee claims these two parcels of real estate.

The appellants claim these parcels also under Elmor Williams, who was the ancestor of all of them except the tenants. Their claim comes about in this way: The widow, Lucy Ann Williams, by proper proceedings taken March 2, 1843, renounced the will. March 11, 1843, the grandchildren—i. e.,· the children of Rebecca Gazlay and of Maria Allen—brought a suit in chancery in the court of common pleas of Hamilton county against all the other devisees and legatees then in being, including Sarah M. Floyd, Lucy Ann Williams, and ·Charlotte C. Williams, the first takers in the devises of the two parcels in suit, and Miles Williams, father of Charlotte C.· Williams, to whom they went in case Charlotte C. Williams died without leaving a child, and the executors named in the document, contesting it as the will of the decedent, and seeking to have it and the probate thereof set aside, which was the mode prescribed by statute for contesting a document admitted to probate as the will of a decedent. The defendants were all duly brought before the court by summons, and guardians ad litem were duly appointed for the infant defendants, including Charlotte C. Williams. On November 15, 1843, an issue "devisavit vel non" was made up, a jury was impaneled and sworn, and after trial on November 30, 1843, the jury returned a verdict declaring that the document was not the will of Elmor Williams. It is not open to question that at this trial the executors of the will and other defendants in good faith endeavored to sustain the document as his will and a fair trial was had. On December 30, 1843, a decree was entered by that court, pursuant to the

verdict, setting aside and holding for naught the probate of the document as the will of Elmor Williams. During the pendency of the suit William E. Gazlay died without issue, leaving Allen W. Gazlay as his only heir. The statutes of Ohio, then in force, provided for an appeal from any judgment or decree in the court of common pleas, including one in a will contest suit, to the Supreme Court of the state, the highest court thereof, which sat in each county and also in banc at the capitol of the state, and which had certain original as well as appellate jurisdiction. The method of taking an appeal was by entering of record an intention to appeal at the term at which the judgment or decree was rendered, and then, within 30 days after the rising of the court, executing a prescribed bond. The defendants in this suit, pursuant to this statute, duly took an appeal from the decree therein to the Supreme Court. The bond, by which the appeal was perfected, was executed January 15, 1844.

Shortly thereafter negotiations began for a compromise of the litigation. To enable it to be effected an act was passed by the Legislature of Ohio February 15, 1844 (42 O. L. p. 70), entitled "An act to enable Charles E. Williams and Allen W. Gazlay to execute deeds of conveyance under certain restrictions," whereby they were authorized to make deeds of conveyance or other writings, for any part of their interests in the estate of Elmor Williams, providing that their legal acting guardians should severally so advise and counsel their execution. It further provided that all other minors named in the will of Elmor Williams were authorized to make deeds or other writings in relation to their interests in his estate, provided that the legal acting guardians of such minors should consent to same in like manner. Thereafter an agreement of compromise entitled "Agreement of Partition of the Heirs of Elmor Williams, Deceased," was entered into. It bears date May 6, 1844. It was executed by all the heirs and the guardians of Charles E. Williams and Allen W. Gazlay, by the main devisees, but not by all of the devisees, and by none of the legatees. The name of Charlotte C. Williams was subscribed thereto by her father, Miles Williams, who also signed it individually. He had not been appointed her guardian until May 22, 1844, so, though the paper was dated May 8, 1844, it could not have been fully executed and delivered until after May 22, 1844. This agreement did not make much change in the distribution of the estate from that made by the will, apart from the parcels devised to the son, Charles E. Williams, and to the widow, as first takers, and those in which Charlotte C. Williams and the children of her body begotten were interested, one of which was devised to the widow as first taker, and from the nature of the estate given by the different devises. In each instance the parties amongst whom the estate was to be divided were to have a fee-simple estate, instead of for life, with remainder as stated and as provided for in the will.

So far as the distribution of the estate was concerned, what seems to have been done was, substantially, to give to the Allen children and Allen W. Gazlay sufficient parcels above those devised to them in the will to place them on an equality with the son, Charles E. Wil-

liams. These came from certain of the parcels ·devised to him, those devised to Charlotte C. Williams, upon the death of the first life tenants, with remainder as stated, the Vine street parcel to go to Allen W. Gazlay, and the Fifth street one to the Allen children, and the other parcels devised to the widow as first taker. Ephraim D. Williams and his seven children were to have the same parcels devised to them by the will, and William P. Hulbert was to have the parcels devised to him with slight deductions. The other devisees were to have the parcels devised to them respectively. And Miles Williams, the father of Charlotte C. Williams, was to have a parcel fronting 95 feet on Fifth street near its junction with Front, a portion of which had been devised to the son, Charles C. Williams, and a portion to William P. Hulbert. Quitclaim deeds were to be made pursuant to the division. Each parcel was to be held by the party to whom it was to go subject to the widow's dower. The balance of the personal estate, after paying expenses, was to be distributed amongst the legatees pro rata, and any deficiency was to be made up out of the real estate divided ·in case it was chargeable therewith under the will. It was provided that the appeal, then pending in the Supreme Court, "shall be dismissed by the appellants and in such a manner as to permit the original decree in the court of common pleas to stand as though no appeal had been taken from such decree, or a decree shall be entered in said Supreme Court of the same character as the one in the court of common pleas."

Thereafter a quitclaim deed, bearing date May 20, 1844, was made to Allen W. Gazlay for the Vine street parcel, and one bearing date July 19, 1844, to the Allen children for the Fifth street one, each of which was subsequently acknowledged. The name of Charlotte C. Williams was signed to each deed by her father, Miles Williams, that to the Vine street parcel being signed "Charlotte C. Williams, by Miles Williams, Legal Acting Guardian," and that to the other, "Charlotte C. Williams, by Miles Williams, Miles Williams, Legal Acting Guardian." Thereafter, at the April term, 1845, of the Supreme Court, the following order was entered in the appeal therein pending, to wit:

"It being made known to the court since the trial of this cause in the court of common pleas an act of legislation has been passed by the Legislature of Ohio authorizing the heirs and devisees of Elmor Williams, the testator named in the pleadings in this cause, to settle and compromise the matter in controversy, and it being admitted that under said act the parties have settled and compromised and deeds executed and delivered, and the defendants making known to the court their desire to abandon the appeal taken in the cause, and the costs of suit having been paid, it is, therefore, ordered and decreed that the appeal be dismissed, and that the parties go hence without prejudice to the rights of the legatees of the said Elmor Williams to charge their respective legacies on the lands devised by the said testator."

Allen W. Gazlay lived until June, 1889, and the appellants in No. 2812 claim the Vine street parcel under his will. He and they have been in continuous possession thereof since 1844, claiming it as their own, and it now rents for $17,000 a year, and, upon renewal of lease, will rent for $20,000. In a division amongst the Allen children, the Fifth street parcel fell to Rebecca A. Allen, and the appellants in No. 2823 claim under her by will and descent. She and they have also

been in continuous possession thereof, claiming it as their own, and it now rents for $3,000 a year. Such, then, is the way in which appellants claim the two parcels in suit.

In this connection it may be noted that the parcel which went to Miles Williams in the division was conveyed to him by quitclaim deed, dated September 23, 1844. By a deed dated November 10, 1859, made pursuant to a decree of the superior court of Cincinnati, in a suit brought by Gideon C. Burton against Miles Williams and his daughter, Charlotte C., he conveyed same to Ephraim D. Williams in trust for Charlotte C. and her heirs. On the death of Charlotte C., in 1904, it passed to appellee by descent, subject to the life estate of his father.

It is now in order to consider the questions raised by these facts as to the ownership of the property.

[1] It must be accepted that, if no appeal had been taken from the decree of the common pleas court setting aside and holding for naught this document and the probate thereof as the will of Elmor Williams, appellee would have no right to the parcels of real estate in dispute herein. This follows from the fact that that court had jurisdiction of the question as to the document being his will, all the parties in interest then in being, including the executors named therein, were duly before the court—guardians ad litem were duly appointed for the infant defendants—and the decree was made after a fair trial before a jury, and it had returned a verdict that it was not his will. There is not the slightest indication that there was any conduct which can be characterized as fraudulent in connection with the obtaining of the verdit and decree. It is true that appellee was no party to the proceeding. But it was impossible to make him a party, as he did not come into existence until 40 years afterwards. The statute required that such a proceeding should be brought within 2 years after the probate. Either there was no right of contest on the part of the plaintiffs therein, or the appellee could not be made a party thereto. It was of necessity that he was not. He was, however, represented in the contest by the executors and other devisees and legatees made defendants to the proceeding, whose interest was identical with his; that is, to uphold the document as the decedent's will.

The case comes clearly, therefore, within the principle of virtual representation, recognized by the Supreme Court in the case of McArthur v. Scott, 113 U. S. 340, 5 Sup. Ct. 652, 28 L. Ed. 1015; and by this court in Pugh v. Frierson, 221 Fed. 513, 137 C. C. A. 223. These cases merely recognized this principle. They did not apply it. There was no occasion to apply it, as neither case came within it. In McArthur v. Scott, which involved a will contest in Ohio, the heirs at law, one of whom brought the suit contesting the will, in reality represented both sides to the contest, and the executors, who held the legal title in trust for the grandchildren, not then in being, had resigned, and no other personal representative, had been appointed and represented this interest. In Pugh v. Frierson necessity was wanting, as the parties claimed to have been affected by the adverse judgment were then in being, and had not been made parties to the suit. Cases where it has been applied are the following, to wit: Gifford v. Hart, 1 Schoales

& L. 386, 408; Fox v. Fee, 24 App. Div. 315, 49 N. Y. Supp. 292; Hale v. Hale, 146 Ill. 227, 33 N. E. 858, 20 L. R. A. 247; Burlingham v. Vandevender, 47 W. Va. 804, 35 S. E. 835.

We do not understand that in cases coming within the principle there is any fiduciary relation between the parties defendant representing the nonparties not in being. The representation is not of the interest of such nonparties, but, the interests being identical, the representation is of the questions on which their interests depend. The matter is thus put in Hale v. Hale, supra:

"If persons in being are before the court who have the same interests (as the unborn) and are equally certain to bring forward the entire merits of the question, and thus give such interests effective protection, the dictates of both convenience and justice require that there should be a complete decree."

In this case the interests of the numerous defendants were identical with that of appellee; i. e., to uphold the will. The record of this suit and all papers in it were destroyed by fire in the burning of the courthouse of Hamilton county on March 29, 1884, and proof as to them was made by an attorney who had taken notes in regard thereto in an examination of title. This did not show that the executors were parties defendant to the suit. And it was thought that, under McArthur v. Scott, this affected the validity of the decree of the common pleas court. But this, to say the least, is questionable. The executors there had the legal title to the property in contest and held it in trust for the unborn grandchildren. No such relation existed here between the executors and plaintiff. And in Ohio it is no part of the duty of an executor to defend a will against a contest. Andrews v. Andrews, 7 Ohio St. 143. Besides, one of the executors and the other and his children were substantial devisees. They were defendants in their individual capacities, and their interests were sufficient to lead them to do all in their power to uphold the will. But, however this may be, by the discovery of the original papers in another suit, the character of which is hereafter indicated, after decree on the original hearing in the lower court and introduced in evidence upon rehearing, it was shown that the executors were parties defendant to the suit.

[2, 3] So it is that it must be accepted that, if no appeal had been taken from the decree of the common pleas court, appellee would have no case. He bases his case principally upon the effect of the appeal which was taken to the Supreme Court. He claims that the effect thereof was to vacate the decree of the common pleas court; i. e., to annul it, to set it aside, or to render it void, just as much so as the granting of a new trial in the common pleas court would have done. This being so, there had to be another trial in the Supreme Court, resulting in a verdict against the will, and a decree accordingly. Otherwise the probate stood, and the devises to him under the will were effective to vest the title in him to the two parcels in question. If we do not misconceive him, such is the reasoning upon which he urges that the decree below should be affirmed.

The fundamental position therein is that the effect of the appeal was to vacate the decree. He supports it by two subordinate positions. One is that in those days, in case of an appeal from a judgment or de-

cree of the common pleas court to the Supreme Court, including a decree in a suit contesting a will, the trial in the Supreme Court was de novo; i. e., exactly as a new trial in the common pleas court was if, on motion of the losing party, it were granted. In other words, necessarily it followed from the fact that the trial was de novo that the effect of the appeal was to vacate the decree of the lower court. Where a new trial was granted in that court, the verdict and judgment or decree thereon were vacated, and the case stood exactly as it stood before they were rendered. So the effect of the appeal to the Supreme Court, which was in order to another trial therein, was to vacate the judgment or decree of the common pleas court. The other subordinate position is that the Supreme Court of Ohio has held that such is the effect of the appeal, which holding is conclusive here. The importance of the case and the earnestness with which these two positions are urged demand at our hands, at the risk of being thought pedantic, a detailed consideration of them, which will be given in the order in which we have stated them.

There can be no question that the trial in the Supreme Court on appeal from the common pleas court was de novo. From the first Constitution of the state, adopted in 1802, to that of 1851, appeals were provided from any judgment or decree of the common pleas court, including that in a will contest, to the Supreme Court. Thereafter until now appeals were provided for from that court to an intermediate court, first styled district court, and then circuit court, and now Court of Appeals. On these appeals, from the beginning until now, the trial in the appellate court has been de novo. There has been, since the Constitution of 1851, a limitation of the cases in which an appeal may be taken; i. e., to a case in which "the right to demand a jury therein did not exist." And the right to make such a demand has not been limited to actions at law. But in all cases which have been appealable since this limitation was made the trial in the appellate court has been de novo, precisely as it was before then in every case. Seemingly, as compensation for the loss in jury cases of the right of securing by appeal a trial de novo in the appellate court, provision has been made for a second trial as of right in the common pleas court. So, always, from the beginning until now, it has been provided that any judgment of the common pleas court may be brought to the appellate court by proceedings in error, first until the Constitution of 1851 by writ of error, and afterwards by petition in error, in which case the trial in the appellate court is not de novo, but upon the record in the lower court as to errors of law. And, since the limitation upon the right of appeal to nonjury cases and the prescribing a new test as to cases in which a jury trial may be had, it has, in some instances, been a delicate question to determine whether the right to go to the appellate court was limited to proceedings in error or might be in both ways. The method of carrying a case to the appellate court by appeal and there having a trial de novo has been more than once noted by the Supreme Court of Ohio as a peculiarity in the method of her appellate procedure. In the case of Grant v. Ludlow, 8 Ohio St. 1, 31, Judge Swan said:

"One of the peculiar features of this appellate jurisdiction was that, unlike a writ of error, which passes upon the record, and unlike an appeal to the Supreme Court of the United States, the appeal to the Supreme Court of Ohio took up the subject-matter of the action at the point where the court below took it up, and proceeded from that point, in respect to pleadings, necessary parties in chancery, testimony, trial, and judgment, in like manner as if the cause had never been tried below."

And in the case of Mason v. Alexander, 44 Ohio St. 318, 327, 7 N. E. 435, 438, Judge Spear said:

"The practice in Ohio is essentially different from the practice in other states in removing cases from general trial courts to appellate courts. While in many of the states, and in perhaps all except our own, an appeal from a court of general jurisdiction is in the nature of a writ of error, whereby the appellate court passes upon the record as to facts as well as law, does not hear additional or other evidence, but confines its adjudications to errors appearing upon the record, in Ohio the appeal itself vacates, without revisal, the whole proceeding as to findings of fact as well as law, and the case is heard upon the same or other pleadings, and upon such competent testimony as may be offered in that court. It takes up the subject of the action de novo, in respect to pleadings, necessary parties, trial, and judgment, in like manner as if the cause had never been tried below."

But does it necessarily follow, from the fact that, on appeal, trial in the appellate court is de novo, that the effect of the mere appeal, without anything more, is to vacate the judgment or decree appealed from? Thought must be consistent with itself. But cannot the judgment or decree retain its vitality upon and after the appeal; ,i. e., coexist with the fact of a trial de novo? Is there any inconsistency between the two? Is it essential that the judgment or decree be devitalized in order to the trial de novo? These questions would seem to answer themselves. Of course, the judgment or decree appealed from necessarily becomes devitalized upon the entering of a judgment or decree in the appellate court. A judgment or decree in both courts cannot coexist. The judgment or decree of the appellate court ipso facto must vacate and take the place of the judgment or decree of the lower court. But until the entering of the judgment or decree in the appellate court, logically, the judgment or decree can retain its vitality along with the right to and fact of a trial de novo. In cases that come here on error or appeal, it is not essential that the judgment or decree of the lower court be vacated, in order that this court may retry the questions of law presented in the one case and the questions of law and fact presented in the other. It is not vacated until it is held that error has been committed and it is so adjudged. It is true that in such cases this court is limited to the record in trying them. But the mere fact that the freedom of action on the part of the appellate court may be so great as to permit it to handle the case exactly as the lower court had done does not require that the judgment or decree be vacated in order to do this. That, logically, the judgment or decree appealed from can retain its vitality along with the right to and fact of a trial de novo until a judgment or decree is rendered in the appellate court, is witnessed by the case of Menuez v. Grimes Candy Co , 77 Ohio St. 386, 83 N. E. 82, 11 Ann. Cas. 1037. By section 5235,

Rev. Stat. Ohio 1906, provision is made for the continuance in force of an injunction granted by a final judgment upon and after an appeal. There an injunction was granted. An appeal was taken, and thereafter the defendant disobeyed the injunction. The question was whether contempt proceedings could be brought in the appellate court. ·It was held that they could. In that case the judgment appealed from, not only retained its validity after the appeal, but it was actually in force, notwithstanding the appeal. Judge Shauck said:

"This * * * was an appeal with a view to a trial de novo, the steps necessary to perfect the appeal being taken in the original suit and requiring neither further pleadings nor process. When defendant perfected its appeal by giving the required notice and bond, the case by operation of law at once passed from the jurisdiction of the common pleas into the jurisdiction of the circuit court. A part of the case which so passed was the perpetual injunction from which the appeal was taken. Thereafter authority to suspend, modify, or enforce the 'pending motions' was exclusively in the circuit court."

The conclusion, therefore, cannot be resisted that there is nothing in the character of the proceedings in the appellate court, after an appeal, which necessitates that the effect of the appeal shall be to vacate the judgment or decree appealed from. Notwithstanding their character, it can retain its vitality until a judgment or decree is rendered by the appellate court, when of necessity it must cease to exist. If the appeal has such an effect, it must be because the statute authorizing the appeal so provides, or the Supreme Court of Ohio has construed it as so providing.

This brings us to the second subordinate position taken by appellee, to wit, that the Supreme Court of Ohio has held that, under the statute in force at the time of the taking of the appeal in question here, the effect of an appeal was to vacate the judgment or decree appealed from. In view of the fact that such statute had an express provision on the subject, and of its nature, it would be strange, indeed, if it has so held. The statute then in force was an act entitled "An act to regulate the practice of the judicial courts," passed March 8, 1831 (29 O. L. p. 58). By section 112 thereof (Swan's Statutes of Ohio, p. 683) it was provided:

"That when an appeal shall be granted, and bond and security given therefor as aforesaid, the judgment or decree rendered in such case, in the court of common pleas, shall thereby be suspended."

Now "vacate" and "suspend" are not synonymous. Vacate means to annul, set aside, or render void; suspend, to stay. When a thing is vacated it is devitalized. It is not when suspended. It may be suspended, and yet retain its vitality. Yet notwithstanding this, it must be conceded that the Supreme Court of Ohio, in referring to the effect of an appeal upon a judgment or decree appealed from, has frequently spoken of the appeal as vacating it. In the case of Long v. Hitchcock, 3 Ohio, 274, decided in 1827, the Supreme Court said:

"The defendant in this case had perfected his appeal before his death. When that was done, the verdict and judgment were vacated."

In the case of Bradly v. Sneath, 6 Ohio, 490, 496, decided in 1834, Judge Wright said:

"A compliance with these requisitions is held necessary to vacate the judgment of the court of common pleas. The jurisdiction of the Supreme Court only attaches to the case when the judgment rendered in the court of common pleas has been thus vacated."

In the case of Lawson v. Bissell, 7 Ohio St. 129, 132, decided in 1857, Judge Swan said:

"The effect of an appeal of a cause tried by a jury is to vacate the submission to the jury, the verdict and judgment; and the district court proceeds in the action appealed as if there had been no trial in the common pleas. So, if the issues are submitted to the court of common pleas, and verdict and judgment rendered by the court, an appeal vacates the verdict and judgment."

In the case of Bell v. Crawford, 25 Ohio St. 402, 409, decided in 1874, Judge McIlvaine said:

"In case of appeal from such judgment, not only the judgment, but the report also, is vacated and entirely superseded, and the case stands in the appellate court as though no reference had been made."

In the case of Aultman v. Seiberling, 31 Ohio St. 201, 204, decided in 1877, Judge White said:

"The effect of an appeal, under our system, is to vacate the order, decision, or decree appealed from, and to carry the cause into the appellate court, both upon the law and facts, the same as if no decision had been made."

In these five cases the judgment or decree itself is said to be vacated by the appeal. Sometimes no reference is made to the judgment or decree as being vacated. It is what preceded it that is vacated.

In Grant v. Ludlow, supra, 8 Ohio St. 30, decided in 1857, Judge Swan said:

"The appeal itself vacated, without revisal, the operation of all the law decided by the court below, and all the findings of fact by the court or jury below."

And in the case of Mason v. Alexander, supra, 44 Ohio St. 328, 7 N. E. 439, decided in 1886, Judge Spear, in the quotation from his opinion made above, said:

"The appeal itself vacates, without revisal, the whole proceeding as to findings of fact as well as of law."

In each of these seven cases the statutory word "suspend" is not used. And if one looked to them alone, he would not have the slightest suspicion that what the statute provided was that the effect of the appeal was to "suspend" the judgment or decree appealed from. But we find cases where it is used alternately with the word "vacate." As, for instance, in the case of Teaff v. Hewitt, 1 Ohio St. 511, 519, 59 Am. Dec. 634, decided in 1853, Judge Bartley said:

"An appeal from a decree is nothing else than a proceeding in the original cause, which continues the case by vacating or suspending the decree till the final hearing in the appellate court."

And in the case of Pittsburg, etc., v. Hurd, 17 Ohio St. 144, 145, decided in 1866, Judge Scott said:

"The effect of such appeal clearly is to vacate or suspend the effect of the order or decree appealed from, till the matter is heard in the appellate court."

In but a single case, save one hereafter referred to, in which the effect of the appeal was directly involved, do we find the statutory word "suspend" used in describing its effect. That is the case of Bassett v. Daniels, 10 Ohio St. 617, decided in 1858. Judge Swan, who, the year before, in Lawson v. Bissell and Grant v. Ludlow, had used the word "vacate," there said:

"The effect of perfecting an appeal to the district court is to render inoperative the judgment of the court of common pleas. The judgment is suspended, and no proceedings can be had under or by force of it, after the appeal is actually taken."

Again:

"The suspension of the judgment, however, by filing the appeal bond, necessarily suspends and puts an end to all proceedings by execution or otherwise on the judgment."

And again:

"The appeal having intervened and suspended the operation of the judgment and the proceedings under it, before the sale was rendered effectual by confirmation, and the confirmation being a material step under the execution, we are of opinion that the court below did right in refusing to confirm the sale, after the judgment was rendered inoperative and in effect vacated by the appeal."

It will be noted that the word "vacated" is here used, but it is the effect of the judgment, and not the judgment itself, which is vacated.

Now in none of these cases was the exact effect of the appeal on the judgment or decree, as between vacation and suspension, involved, and they are not authorities in support of the position that the effect thereof is to vacate and not merely to suspend. But how did it come about that, in describing such effect, the word "vacate" was used, and not "suspend." Surely some explanation is to be found of this. The Supreme Court cannot have intended to substitute one word for the other in the statute. And it is to be found, principally, in the legislation on the subject of appeals before the act of March 8, 1831. The first act after the adoption of the Constitution of 1802 providing for appeals from the common pleas court to the Supreme Court was an act entitled "An act organizing the judicial courts," passed April 15, 1803 (1 O. L. p. 35). Section 9 thereof provided for the allowance of such an appeal, of course, bond to be given for prosecuting the appeal to effect. This was the sole provision on the subject. Nothing was said as to the effect of the appeal on the judgment or decree appealed from, or as to the procedure in the Supreme Court on the appeal. No provision was contained therein as to granting a new trial in either court. In the act entitled "An act to reduce into one, the several acts organizing the judicial courts, defining their powers and regulating their practice," passed February 16, 1810 (8 O. L. p. 259), by section 11 thereof, the Supreme Court and courts of common pleas were empowered to grant new trials in cases where there had been trials by jury for the reasons for which new trials had usually been granted in the courts of law, provided that not more than two new trials be granted to the same party in the same cause. And by section 12 it was provided that, if a new trial be granted, "the former judg-

ment shall be thereby rendered void." By section 40 provision was made for the allowance of appeals from the common pleas courts to the Supreme Court, and the method of taking such appeals was prescribed, the same as that which has prevailed ever since. And by section 42 it was provided:

"That when an appeal is granted and bond and security given therein as aforesaid, the judgment or decree rendered in such cause in the court of common pleas shall thereby be rendered void."

Thus it was provided in express terms that the effect of the appeal was to render void—i. e., to vacate—the judgment or decree appealed from, just as it would have been so rendered or vacated by the granting of a new trial in the common pleas court. The granting of a new trial and the taking of an appeal were placed on exactly the same basis so far as their effect on the judgment or decree of the common pleas court was concerned. The provisions as to the effect of granting a new trial and taking of an appeal were continued in the act entitled "An act to organize the judicial courts and regulate their practice," passed February 26, 1816 (14 O. L. p. 310).

By section 2 of an act entitled "An act regulating judgments and executions," passed February 16, 1805 (3 O. L. p. 69), provision was made for a lien on the real estate of a judgment debtor to secure the judgment. Of course the effect on such liens of the taking of an appeal from a judgment after the act of February 16, 1810, whereby the judgment was rendered void, which was continued in the act of February 26, 1816, was the same as granting a new trial; i. e., to vacate and remove the lien. Such continued to be the effect of an appeal on a judgment or decree and the lien to secure same until the act entitled "An act to organize the judicial courts and regulate their practice," passed February 18, 1824 (22 O. L. p. 50). By section 100 thereof it was provided that on an appeal—

"the lien of the opposite party upon the real estate of said appellant created by said judgment shall not be by said appeal removed or vacated, but the real estate of said appellant shall be bound in the same manner as if said appeal had not been taken, until the final determination of the cause in the Supreme Court."

This provision was inconsistent with a provision that the effect of an appeal from a judgment or decree would be to render it void. So we find that the provision in the acts of 1810 and 1816 to this effect was not contained in the act of 1824. Instead thereof it was provided in section 102:

"That when an appeal is granted and bond and security given thereon as aforesaid, the judgment or decree rendered in such case in the court of common pleas shall thereby be suspended."

And from that day to this these two provisions as to the existence of the lien after appeal and the effect of an appeal have been continued in the statutes of Ohio.

It is thus seen that the use by the judges of the Supreme Court of the word "vacate" to describe the effect of an appeal from a judgment or decree is a mere reminiscence of the days when such was in fact the effect thereof. Having got in the habit during those days of so de-

scribing it, they, and no doubt the legal fraternity generally, continued to so describe it after the statute had substituted the word "suspend" for the words "render void." It is not unlikely, also, in view of the consideration that after an appeal was taken the situation of things was so analogous to that existing upon the granting of a new trial in the common pleas court, entirely so, except as to the effect of the taking of an appeal on the judgment or decree appealed from 'as compared with the granting thereof, it was not realized, there being no occasion to think the matter out, that they were not analogous in this particular. Besides, whilst the effect of the mere appeal was not to vacate, the entering of a judgment or decree on the appeal necessarily had the effect of vacating that appealed from. And what was had in mind in using the word "vacate" may not have been the effect of the mere appeal itself, but of it and the entire proceeding, including the judgment or decree thereon, in case the appeal was not dismissed. That the use of the word "vacate," after the act of 1824, to describe the effect of the appeal, was not only inaccurate, but misleading, is evident from a statement of Judge Thurman in the case of Ewers v. Rutledge, 4 Ohio St. 210, 214, decided in 1854. He there said:

"It is true that section 9, before quoted, differs in language from the former statutes respecting appeals. Under the old law, an appeal vacated the judgment appealed from, but preserved its lien; the present statute declares that the judgment shall be 'suspended.' But the purpose in both statutes is, we imagine, the same—namely, to preserve the lien—for the Legislature could not have intended that there should be two judgments in force; one rendered by the common pleas, and the other by the district court."

The statute, section 9 of which he had quoted, was an act entitled "Regulating appeals to the district court," passed March 23, 1852 (50 O. L. 93). It was precisely the same as section 102 of the act of February 18, 1824, and section 112 of the act of March 8, 1831, heretofore quoted; i. e., it provided, the same as they did, that the effect of the appeal was to suspend the judgment or decree appealed from. It is apparent that Judge Thurman thought that the statutes prior to the act of March 23, 1852, provided that the effect thereof was to vacate such judgment or decree, not as the act of March 23, 1852, which provided that the effect was to suspend. Where, then, did he get any such notion? Certainly not from a consideration of the former statutes themselves. A consideration thereof would have shown him that they were precisely the same as the then existing statute of March 23, 1852. He could only have gotten it from the decisions of the Supreme Court, in which, as shown above, the effect of the appeal was almost uniformly described as being to vacate. That he had such notion accounts for his not realizing that the vacation of a judgment and preservation of a lien to secure it cannot coexist in thought. It was aided by the consideration that, though an appeal did not vacate the judgment of the common pleas, judgment thereon in the Supreme Court did, as it was not possible, as he stated, for the two judgments to be in force; i. e., at the same time.

There is nothing, therefore, in this use of the word "vacate" to describe the effect of an appeal, by the judges of the Supreme Court, to conclude the question as to what was really the effect thereof after

1824, and at the time of the taking of the appeal in question here. And it is clear that the effect thereof was not to vacate the judgment or decree appealed from, but only to suspend it until a judgment or decree was rendered in the appellate court, so that, if before the rendition thereof the appeal was dismissed, it would not only be in existence as a judgment, but also effective to bar rights and enforceable to obtain rights thereby conferred. The considerations in support of this position are these. The statute was controlling as to the effect of the appeal, and it merely provided that it should suspend the judgment or decree of the lower court. In so providing it substituted the word "suspend" for the words "render void," thereby indicating that suspend did not mean the same thing as render void. It so did to make this provision consistent with the provision that the lien of the judgment or decree should be preserved, notwithstanding the appeal. The latter provision is inconsistent with a provision that the judgment or decree is vacated by the appeal. Though, possibly, such inconsistency is to be found in the provision of section 8 of the act of March 31, 1859 (56 O. L. 93; Swan & Critchfield, vol. 2, p. 1160), whereby it was provided that the granting of a second trial in the common pleas court should not remove or vacate the lien of the judgment entered upon the verdict on the first trial, and it cannot be done away with except on the view that the effect of the granting of such second trial is not to vacate such judgment.

But beyond these considerations the Supreme Court of Ohio has held that, the necessary effect of which is that the effect of an appeal is not to vacate, and has said in so many words that such is not its effect. We have referred to the fact that from the very beginning, not only has the losing party in the common pleas court had the right to carry a case to the appellate court by appeal, but also by proceedings in error. Whilst the acts of 1810 and 1816 were in force by which it was provided that the effect of an appeal was to "render void" —that is, to vacate—it is not conceivable that these remedies could be prosecuted contemporaneously. There would be no room for a reversal on error of a judgment which had already been vacated or rendered void by appeal. But after the act of 1824, and during the existence of all subsequent acts, if the effect of an appeal was not to vacate, but merely to suspend, as the statute provided, it is conceivable that they could be so prosecuted. And when it became a delicate question as to which was the proper remedy, lawyers began to pursue both remedies, so as not to fail of a hearing in the appellate court because of a mistake in the choice of remedy. Where this was done, and the case was appealable, the right to pursue the remedy in error necessarily involved the question as to the effect of the appeal on the judgment or decree appealed from. If it was to vacate it, the proceeding in error must fail, for, as stated, there is no room to reverse on error a judgment or decree that has aleady been vacated by appeal.

This question came before the Supreme Court of Ohio in two late cases, to wit, Hull v. Bell, 54 Ohio St. 228, 43 N. E. 584, and Jenney v. Walker, 80 Ohio St. 100, 88 N. E. 123. In each case appeal lay. In one, the right of appeal was questioned; in the other, it was not.

In Hull v. Bell, defendants, against whom a judgment was rendered in the common pleas court, appealed and brought error to the circuit court. The latter dismissed the appeal and affirmed the judgment. Separate proceedings in error were prosecuted to the Supreme Court. It held that the case was appealable, and reversed the judgment of the circuit court dismissing the appeal. This left for disposition the proceeding to reverse the judgment of the circuit court, affirming the judgment of the common pleas court. If the effect of the appeal was to vacate the judgment of the common pleas court, the action of the circuit court in affirming it was error, and should have been reversed. A judgment that had already been vacated by appeal should not be affirmed on error. The only thing to do would be to dismiss the proceeding in error, because there was no judgment after the appeal on which it might operate. But the Supreme Court did not so act. It held that, the case being appealable, appellant did not need the proceedings in error to the circuit court. He could obtain correction of any error of law committed by the common pleas court on the appeal. And the affirmance of the judgment by the circuit court was not in the way of his so doing. Judge Williams said:

"The judgment rendered on the appeal becomes the final judgment fixing the rights of the parties, and that appealed from is no longer operative; and its affirmance on error, before trial had on the appeal, can give it no 'additional or different' effect that it did not have without such affirmance."

It therefore dismissed the proceeding in error before it, prosecuted to the judgment affirming the judgment of the common pleas court.

In Jenney v. Walker, appeal was taken from a judgment of the probate court to the common pleas court, and afterwards proceedings in error were presented to the same court. Thereafter the appeal was dismissed, and thereupon the defendant in error moved to dismiss the proceeding in error on the ground that there was no judgment to reverse for error, as the judgment of the probate court had been vacated by the appeal. The common pleas court sustained the motion. The circuit court reversed the action of the common pleas court, and the Supreme Court affirmed its action. Of course, if the effect of the appeal had been to vacate the judgment appealed from, the common pleas court was right in dismissing the proceeding in error. It was only because such was not the effect of the appeal that it could be said that it was wrong in so doing.

The case of Willson Improvement Co. v. Malone, 78 Ohio St. 232, 85 N. E. 51, is not in point here. There both appeal and error were prosecuted. But, as the case was held not to be appealable, the appeal was not in the way of the proceeding in error. In both Hull v. Bell and Jenney v. Walker, however, the case was appealable. That being so, if the effect of the appeal was to vacate the judgment appealed from, it was error on this ground alone for the circuit court to affirm the judgment of the common pleas court in the one case, and not error for the common pleas court to dismiss the proceeding in error in the other. And the action of the Supreme Court in refusing to reverse the judgment of the circuit court in the one case, and its affirming the judgment of the circuit court, reversing the judgment of the

common pleas court in the other, cannot be accounted for on any other ground than that the effect of the appeal was not to vacate, but only to suspend, as the statute provided. The effect of the appeal was necessarily involved in both cases, and both of them are direct authorities, therefore, against appellee's contention.

The other thing which the Supreme Court of Ohio has held, the necessary effect of which is as stated, is that an appeal in a proper case and properly taken may be dismissed by the appellant on his motion, and upon such dismissal the judgment appealed from becomes operative. In the case of Irwin v. Lloyd, 65 Ohio St. 55, 61 N. E. 157, suit was brought by a creditor against an assignee for benefit of creditors in the court of common pleas to compel the allowance of his claim by the assignee. It dismissed the petition on the ground that the claim was barred by the statute of limitations. An appeal was taken from this judgment, and subsequently dismissed by the appellant. During the pendency of the appeal the creditor sued the debtor and obtained judgment against him, and after the dismissal of the appeal brought another suit in the common pleas court against the assignee, to compel the allowance of the judgment. It was held that this suit was not maintainable. Though the only thing decided, according to the syllabus, which is the law of the case, was that a judgment against a debtor obtained after assignment is not a valid claim against an assigned estate, in the course of his opinion in the case Judge Davis said:

"Here the trustee had exercised his statutory privilege by rejecting the original claim, for the reason that it was barred by the statute of limitations. In this he was sustained by the judgment of the court of common pleas. Having appealed to the circuit court, the plaintiffs saw fit to dismiss their appeal without prejudice. Although not so in terms, this was in effect a final dismissal, because there could be no second appeal. The contention as to that claim thereafter was res adjudicata as far as it concerned the assigned estate, represented by the trustee."

According to this, therefore, an appeal is subject to dismissal by the appellant, and after dismissal the judgment appealed from is res adjudicata. The case of B. & O. R. R. Co. v. City of Washington, 34 Weekly Law Bulletin, 266, was affirmed without opinion. We gather, from the report of the case there made, that the suit brought in the common pleas court was decided in defendant's favor. The plaintiff took an appeal from the judgment dismissing his petition. Thereafter, in the appellate court, plaintiff moved to be permitted to dismiss the suit without prejudice. This was overruled, and the appeal was dismissed for want of prosecution. The plaintiff brought error to the Supreme Court, which affirmed the judgment of the lower court, thus holding that plaintiff had no right to dismiss his case, but that his appeal might be dismissed for want of prosecution. The argument of defendant against plaintiff's right to dismiss his case was that a plaintiff, by appealing from an adverse judgment and then dismissing his case on the appeal, could commence over again, follow the same course, and thus prevent defendant from having or obtaining a final adjudication of the controversy. The argument of plaintiff against the right to dismiss the appeal was that the appeal vacated the judgment of the lower court and vested the appellate court with complete jurisdiction

precisely as if the jurisdiction was original. The statute conferred no authority to dismiss the appeal, and it could be dismissed only when the appellate proceedings were defective; and, it might have been added, if the case was nonappealable. So that the only course to pursue was to dismiss the suit with or without prejudice. The Supreme Court, in affirming the judgment, upheld the one argument and decided against the other.

The appellee relies on the case of Banning v. Kirby, 7 Am. Law Record, 601, a decision of the district court of Hamilton county, as aiding him in another particular. It was decided therein that one of several appellants in a will case could not dismiss the appeal against the objection of the others. This decision presupposes that all the appellants could dismiss it. If all could not dismiss, why argue whether some could?

Apart from these decisions, unless there was an express provision against the dismissal of an appeal, one would expect it to be dismissible. And, if dismissible, a dismissal should leave the judgment appealed from in force the same as if no appeal had ever been taken. This it could not do if the effect of the appeal was to vacate the judgment.

In addition to all this, it has been set forth in so many words, in an opinion of the Supreme Court of Ohio, that the effect of an appeal was not to vacate. This was done in the case of Jenney v. Walker, supra, by Judge Crew. He said:

"The error of such contention or claim is found in the fallacy of the premise upon which it rests, namely, that the appeal cancels and destroys the judgment. The effect of the appeal is not, as assumed by counsel, to vacate and destroy the judgment appealed from; but its only effect is to suspend such judgment, and to stay proceedings to enforce its execution. It does not operate to annul the judgment, or to otherwise impair its vitality and obligation than by merely suspending its enforcement during the pendency of the appeal. The lien, if any, created by the judgment, is not removed or vacated by the appeal, but subsists and continues in the same manner and to the same extent as if the appeal had not been taken."

There is nothing in the opinion in Drake v. Tucker, 83 Ohio St. 97, 93 N. E. 534, inconsistent with or in conflict with this statement of Judge Crew in the slightest particular. The statement therein that on an appeal the trial is de novo is not so. There can be, as we have shown, a trial de novo without devitalizing the judgment appealed from.

Several odds and ends remain to be disposed of before our consideration of this fundamental position of appellee, that the effect of the appeal in question here was to vacate the decree of the common pleas court setting aside the document probated as the last will of Elmor Williams, is complete. The appellee relies on the case of Long v. Hitchcock, supra, in support of his position. That was an action at law for slander. By the common law, then in force, the death of defendant in such an action abated the action. The plaintiff recovered judgment in the common pleas court. The defendant appealed to the Supreme Court. After the appeal, and before trial therein, he died. It was held that the action, and not the appeal, abated by his death. This

is not against the position that the effect of the appeal is not to vacate the judgment. Whilst the appeal itself does not have such effect, judgment on the appeal does.

Again, by section 23 of an act entitled "An act relating to wills," passed March 23, 1840 (Swan's Statutes of 1841, p. 895), in force at the time of the probate of the will in question and the proceedings in the common pleas and Supreme Courts in relation thereto, it was provided as follows:

"In such a suit in chancery an issue shall be made up, whether the writing produced be the last will of the testator or not, which shall be tried by a jury, whose verdict shall be final, between the parties, unless the court shall grant a new trial or the cause be appealed to the Supreme Court."

Here it is true that the granting of a new trial and the taking of an appeal are treated alike, but not in their effect on the vitality of the verdict and judgment thereon, but upon the right to retry the question as to whether the document was the last will of the testator. So far the effect of granting a new trial and the taking of an appeal are exactly alike.

And again, the suit, papers in which were found after the original hearing in the lower court and introduced in evidence upon rehearing, heretofore referred to, was a suit by seven of the legatees in the will, whose legacies amounted, in the aggregate, to $4,000, and who had received slight payment on them from the personalty, to recover the balance of them from the parties amongst whom the real estate was divided. They obtained in the court of common pleas a decree, and this decree was affirmed in the Supreme Court. This record was introduced by appellants to show that the executors were parties defendant to the suit contesting the will. Appellee contends that it had a boomerang effect, in that it shows that the Supreme Court had held that the will was still in force, notwithstanding the decree of the common pleas court setting it and the probate thereof aside, and this it could only have done on the ground that the effect of the appeal was to vacate that decree. But it was not held therein that the will was still in force. It is true that the provisions of the will were construed as if it were still in force, and it was held that the will charged the legacies against the rents of the real estate, in case of a deficiency in the personal estate. This, however, was because it was an express term of the agreement of compromise that the persons amongst whom the real estate was divided should not have to make up any deficiency in the personal estate, unless such was the proper construction of the will. The parties evidently acted upon the idea that this was the only question in the case, and that, if such was the proper construction thereof, such persons were bound to meet such deficiency, and that because of the agreement, and not because of the will.

[4] The conclusion of the whole matter, therefore, is that the appellee's fundamental position that the effect of the appeal was to vacate the decree of the court of common pleas setting the document and probate thereof as the will of Elmor Williams aside is not sound. It did not so do. It did not to any extent affect the existence and vitality of the decree. In the language of the statute the appeal merely sus-

pended the decree; i. e., stayed its enforcement. What, then, followed from the dismissal of the appeal? It is urged that the appeal was not dismissible as to the infant appellants, including Charlotte C. Williams, by their guardians ad litem, and hence, under Banning v. Kirby, supra, to no extent. It is not necessary to determine the correctness of this position. It was in fact dismissed. If the position is correct, and the matter can now be inquired into, the sole effect thereof is that the appeal is still pending. It cannot have the effect of vacating the decree setting aside the document and its probate, and thus placing appellee in position to assert a right to the property in question thereunder. That would seem to have followed therefrom which follows from the dismissal of any appeal, to wit, the decree, stayed by the appeal, thereupon became enforceable, as much so as if no appeal had been taken. Clearly such would have been the case, had it been dismissed by appellants without consideration to any of them therefor. They were not bound to take an appeal, and the validity of the decree against appellee would have been in no wise affected by their failure to take one. He had been barred by their defense in good faith against the attack in the common pleas court, and their nonaction thereafter could not affect the matter. He had no claim on them that they should take an appeal. So he had no claim that they should prosecute the appeal to a decree. Is it any different because it was not so dismissed, that after it was taken the agreement of compromise was entered into and substantially performed, and that it was pursuant thereto that the appeal was subsequently dismissed?

The appellee makes much ado about the fact that no provision whatever was made therein for his mother Charlotte C. Williams, and himself. She was the only one of the existing beneficiaries for whom no provision was made, except the widow. who had renounced the will and taken under the law. All the other existing beneficiaries, except Charles E. Williams, the son, had received under the agreement substantially the same that they would have received under the will and that absolutely. There is, however, no occasion for one being wrought up on behalf of appellee as against appellants here because of this. Charlotte C. Williams is not here complaining. Charles E. Williams, the infant son, who, along with her, suffered by the agreement, as compared with the will, seems never to have complained of his treatment. The children of the bodies begotten of all the other first takers of the real estate, as well as appellee, lost out, and it does not appear that any of them, of whom there must have been some, ever so complained. Charlotte C. Williams in the course of time received what had been conveyed to her father, Miles Williams, and on her death it passed to appellee, subject to his father's life estate. Beyond all this, the fact of a wrong having been done Charlotte C. Williams and appellee by the agreement depends entirely on whether the document in question was the last will of Elmor Williams. A jury, after a fair trial, found it not to be his last will. On its face it is marked by eccentricities, to wit, unusual generosity to those not the natural objects of his bounty, favoritism amongst those who were, unkind attitude towards his wife, antipathy to his son-in-law and another person, and

a purpose to tie up a large body of valuable real estate in the heart of a growing city with contingent remainders. The fact that the grandchildren who contested were willing to quit short of getting all that would have been coming to them without a will need not be indicative of a serious weakness in their case. They did receive a substantial addition to what was coming to them under the will, and it may have been prudent caution to be content therewith rather than run the risk of another trial. Possibly, also, the beneficiaries of the will, who were defending, had the advantage of them in pugnacity as well as in numbers and funds.

The meaning of all this is that we are not in position to form any judgment that the document was the last will of Elmor Williams, and, in the absence of such a judgment, there is no room to be concerned about any injustice done Charlotte C. Williams and appellee by the agreement. It is possible that the real wrong done thereby was to the grandchildren, under whom appellants claim, and the infant son, and the withholding from Charlotte C. Williams and appellee of any part of the fruits of this wrong was not by them, but by those who brought it about. What we have to do with here, then, is a purely legal question; i. e., whether the circumstance that the appeal was dismissed pursuant to this agreement of compromise, whereby the estate was divided and distributed as therein provided, makes any difference from what would have been the result if it had been dismissed without any concession made to the appellants therein, and solely because of a feeling by them that it was useless to further prosecute the appeal, in which case appellee here would have been barred.

In the case of Holt v. Lamb, 17 Ohio St. 385, Judge Welch said:

"The verdict of a jury is the only instrumentality given by which to invalidate or set aside the probate."

In view of this it is possible that if, whilst the case was in the common pleas court, a consent decree had been entered setting aside the probate and dividing the estate as provided in the agreement, without the intervention of a jury, the decree would have been invalid even as to the parties to the proceeding. Walker v. Walker, 14 Ohio St. 157, 82 Am. Dec. 474; Holt v. Lamb, supra. Certainly it would have been invalid as to the appellee here, and all other persons not such parties. Such a case would have been one for the application of the doctrine of McArthur v. Scott in its full force. Possibly, also, notwithstanding the verdict of the jury in the common pleas court after a fair trial and decree therein, if the appeal to the Supreme Court had not been dismissed, but such a consent decree had been entered there, the same result would have followed. We are not concerned to determine this. No such nor any other decree was entered there. It is not possible to say, therefore, that the decree of the common pleas court was vacated by a decree in the Supreme Court on the appeal, which took its place. All that was done was to dismiss the appeal. The agreement was a thing done out of court. It was not made the decree of the Supreme Court. Its sole function was to supply the motive for dismissing the appeal. If, whilst the right to take an appeal still existed, but before it had been taken, the agreement had been entered into,

and, because thereof, no appeal was taken, there would have been no room for appellee to claim that the document was in force as the last will of Elmor Williams, and hence he was entitled to the property in dispute. So here, though the appeal had been taken, when the agreement was entered into and it was dismissed pursuant thereto, there is no such room. The document and the probate thereof were set aside by the decree of the Common Pleas Court. The appeal therefrom to the Supreme Court did not vacate that decree. It merely suspended it. The decree was still in existence, notwithstanding the appeal, and had as much vitality as it had before the appeal was taken, or would have had, had not the appeal been taken. The dismissal of the appeal did not add to its vitality. It simply removed the obstacle to its enforcement. It was not possible for the motive for the dismissal or the manner in which it was brought about to give it any other effect. It could not have vacated the decree of the common pleas court, which vacated the probate, thereby leaving the document in force as the last will of Elmor Williams, the only position on which appellee can base his right to recover. And if any wrong was done appellee in the agreement of compromise of which he can now complain, the sole effect thereof is to entitle him to have the dismissal of the appeal set aside by the court which made it. It cannot entitle him to recover the property in dispute on such a basis.

We are therefore constrained to hold that the ownership of the property in dispute is with appellants. The decree of the lower court is reversed, with directions to dismiss the bill.

## On Petition for Rehearing.

Appellee has not apprehended the exact and only ground upon which we have decided against him, and the sole necessity for making response to his petition is, if possible, to render it plain to him what that ground is. This consideration alone makes it worth while that we say something further. In doing so we do not admit that the opinion is not clear on this point.

The appellants are in possession of the property in controversy, and appellee seeks to recover it from them. The question in the case is whether he is the owner, and not whether they are the owners, thereof. We put it this way, not because of any doubt as to whether they are the owners, but that this question may be viewed aright. Appellee claims to be the owner by virtue of the probate, February 14, 1843, of the document of date November 28, 1842, as the last will of Elmor Williams. If that probate is still in force, he is the owner. We conceded as much in the opinion. It is equally true that, if it is not still in force, he is not the owner. Appellee has not contended otherwise. His case depends on the truth of the proposition that it is still in force.

The probate was set aside and held for naught December 30, 1843, by the decree of the common pleas court. This decree was a binding decree as to appellee, as well as to the parties to the suit in which it was entered. And, if it is still in force, as it was from the time it was entered until January 15, 1844, when the appeal to the Su-

preme Court was perfected, the probate is not still in force, and the appellee is not the owner. As to these two propositions appellee has not contended otherwise.

This decree is now in force, as it was then, and it has been so in force ever since April, 1845. This is so because at that time the appeal therefrom was dismissed. As the sole effect of the appeal was to suspend the decree during its pendency and until a decree in the Supreme Court, a dismissal thereof before such a decree put it in force thereafter, just as it would have been had no appeal been taken.

[5] This was to no extent affected by the claims of appellee, to wit, that his mother and he were no parties to the agreement and deeds pursuant to which the dismissal was made, and that they were a fraud on them. The appeal was in fact dismissed, though wrongly so, if he is right. The sole possible effect of its having been wrongly dismissed is, either that the appeal is still pending, or that appellee is entitled to have the dismissal set aside and appeal reinstated. It did not have the effect of vacating the decree. We have yet to learn that the wrongful dismissal of an appeal vacates the decree appealed from. That the appeal may be still pending, or that appellee is entitled to have the dismissal set aside and the appeal reinstated, each of which is far-fetched, and which we do not concede, does not render the probate in force, so that the appellee can assert that he is the owner under it.

That the manner in which the dismissal of the appeal was brought about did not vacate the decree was practically conceded by the appellee. This he did by the position which he took that the appeal itself vacated the decree. Of course, if this was the effect of the appeal, the dismissal thereof did not reinstate it, and the decree has not been in existence, much less in force, since it was taken; whereas, on the other hand, the probate has been in force since the dismissal of the appeal, and appellee is the owner. It was here that we differed with the appellee. A careful consideration of the statutes of Ohio and the decisions of the Supreme Court of Ohio drove us to the conclusion that the effect of the appeal was to suspend, and not to vacate, the decree.

The exact and only ground, therefore, of our decision against appellee, was that the probate, the sole basis of his claim, is not still in force. This is because of the decree, which set it aside; and, though it was suspended by the appeal, the dismissal put it in force again, and it has been so ever since. This is not sophistry. It is downright truth.

Appellee has it that we decided against him on the ground that he had been deprived of his title by the agreement of May 8, 1844, and deeds thereunder, pursuant to which the appeal was dismissed. He charges us with assuming that his mother, though only four years old, was authorized by the statute of February 15, 1844, to execute the agreement and deeds, and that she and he were parties to them and bound by them. He says that he was surprised to find that the court rested its opinion largely upon this assumption, and that it is the only possible basis therefor. Furthermore, he gathers from the opin-

ion that we think that this agreement was a meritorious one. He expresses surprise at this, and that we found no fraud or collusion between his grandfather, Miles Williams, and the other parties to the agreement, and states that it seemed incredible to him that it did not shock our sense of justice. And he claims that our conclusion was a sanctioning of the agreement.

Nowhere in the opinion did we take position that appellee was affected by the agreement or deeds. Nor is there the slightest warrant for the claim that we made the assumption stated. It would seem that the thought that we so assumed arose from the consideration that, in setting forth the facts of the case, we stated that the agreement, though dated May 8, 1844, could not have been fully executed and delivered until after May 22, 1844. This was an inference from the fact that Miles Williams, who signed the name of his daughter thereto as guardian, was not appointed guardian until that date. Appellee thinks that we drew that inference as a basis for the position that the agreement was binding on his mother and him. And it is on this slight thread that he hangs the claim that we so assumed, and that this assumption was the basis of the decision. The inference, we still think, was a sound one; but there was no motive behind it, other than a historical one—i. e., to state all the facts in regard to the agreement as we gathered them from the record. Not only did we not make any such assumption; we did not think that there was any basis whatever therefor. In our opinion, then and now, appellee's mother and he were no parties legally to the agreement or deeds. They were not bound by them, and appellee's rights were not affected thereby. We did not express ourselves to this effect, because there was no occasion for us to do so. Appellants were not claiming that appellee was affected by them, as he himself notes, and it was palpable that he was not.

We said nothing intimating that the agreement was meritorious; nor did we sanction it by the conclusion we reached. It is true that we expressed no opinion as to whether there was any fraud in the transaction and that we were not shocked by it. Here, too, there was no occasion to express any opinion, as, conceding that there was fraud, appellee's case was not bettered thereby. As before stated, the sole possible effect thereof was that appellee was entitled to have the dismissal of the appeal set aside and the appeal reinstated. The effect thereof was not to vacate the decree which set aside the probate, the sole basis of appellee's claim. It is the decree which is in the way of appellee's success, and not the agreement and deeds, and until he can show that in some way it has been vacated he can make no progress. He does not show it by making good that his grandfather, Miles Williams, sold out his mother and him.

It is true that we were not shocked by the transaction pursuant to which the appeal was dismissed. We were not shocked for two reasons. One is that we conceive that it is rarely, if ever, a good thing for a judge, whose prime function is to see things as they are, ever to be shocked. It is not essential to doing justice. It may result in injustice. L. & N. R. R. Co. v. W. U. Tel. Co. (D. C.) 218 Fed. 91, 95.

The other is that, taking a broad view of things, there was no real occasion for being shocked. Unless the document in question was in fact the last will of Elmor Williams, it cannot be said that any real wrong was done the appellee, no matter how reprehensible was the conduct of his grandfather, and of those who took advantage of it. It is impossible for one, this far away from those days and with the meager information at hand, now to say that it was. It does not follow, from the fact that Elmor Williams executed the document and that it was probated as his last will, that it in fact was such. A jury in the common pleas court, after a fair trial, found that it was not. To say the least, if the appeal had not been dismissed, it is just as likely that a jury in the Supreme Court would have found the same way as that it would have found in favor of the document. If it would have found against it, the appellee was not hurt by the dismissal. It was the ancestors of appellants who suffered thereby. All that appellee can complain of us for doing is in deciding that the effect of the appeal was not to vacate the decree, but only, as the statute expressly provided, to suspend it, and that we could not help.

The petition for rehearing is overruled.