WINKLER ET AL. *v.* STATE

[No. 25, October Term, 1949.]

2

4

6

*Decided November 17, 1949.*

The cause was argued before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*I. Duke Avnet, William H. Murphy* and *Harold Buchman*, with whom was *Edgar Paul Boyko* on the brief, for the appellants.

*Kenneth C. Proctor, Assistant Attorney General*, with whom were *Hall Hammond, Attorney General, J. Bernard Wells, State's Attorney for Baltimore City, Alan H. Murrell, Assistant State's Attorney*, and *Anselm Sodaro, Assistant State's Attorney*, on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

The Young Progressives of Maryland decided to test the policy of the Board of Recreation and Parks in Baltimore City in relation to interracial tennis playing in Druid Hill Park, a public park of that City, on July 11, 1948. This organization was interracial, numbering among its members both colored and white people of all religions and creeds. As a result of this decision, Stanley L. Askin, State Director, and one of the appellants here, wrote to the superintendent of recreation and notified him what was proposed. The superintendent of parks replied to this letter, stating that due to the Board's policy of segregation, permission could not be granted. Thereafter, on July 8th, a meeting was held with the superintendent, which was attended by Askin, by the executive secretary of the National Association for the

8

Advancement of Colored People in Maryland, by Harold
Buchman, one of the appellants, a member of the Bar
and Director of the Progressive Party in Maryland, by
the assistant Director of the Progressive Party, by two
representatives of the Afro-American Newspaper, and
by one of the members of the Young Progressives. The
Superintendent, Mr. Hook, was informed that these
parties felt that there was no law or regulation which
prohibited them from having an interracial tennis game,
that they felt it was their right to have such a game, and
that they proposed to try this on July 11th. Requisite
permits were obtained by those intending to play, and
on July 11th those selected to test the question arrived
on the tennis courts for which they had permits, claimed
these courts, and began to play in mixed groups, white
and colored, male and female. At the meeting of July
8th, Mr. Hook advised members of the group present
that segregation was the Board's policy, although there
was no rule. There was some question of forwarding
a copy of the minutes to some one of the Young Progres-
sive members, and it was suggested to Mr. Askin by
Mr. Hook that the matter be tested by applying for a
permit, and having it denied, and then going to court,
but the members of the group replied that they would
proceed in their own way. The booklet issued by the
Park Board, containing rules and regulations with re-
spect to the use of the public parks admittedly contained
no statement that colored and white persons could not
play tennis together in the public parks of Baltimore.

When playing started on July 11th, the captain of the
Baltimore Park Police saw the mixed tennis games going
on and a crowd of people, which he estimated at between
250 and 300, watching. He requested that this playing
be stopped, and Mr. Buchman, who apparently was acting
as advisor to the group, said they were not going to stop,
and it is testified that he told the others to go ahead and
play. Thereupon a number of policemen were called,
and fortified with these additional officers, the request

was again made that playing be stopped, and when this request was not complied with, the players were arrested. Some of the players sat down on the courts, and had to be removed bodily, and afterwards there was some disorder and name calling by some of the spectators. It does not appear that there was any disorder prior to the arrests. The occurrence mentioned took place at a time when a campaign was being conducted for the presidency of the United States, by what was known as the Progressive Party, headed by Henry Wallace. One of the chief contentions of that party was that segregation should be abolished. The Young Progressives were not officially allied with the Progressive Party, but the Progressive Party itself, according to Mr. Buchman, took official action supporting the test. Leaflets were sent out asking people to come, and generally distributed, and as a result of the leaflets, a number of spectators appeared. Some of these leaflets read as follows:

"Kill Jim Crow!"

"Demand Your Rights!"

"Organize to smash discrimination in recreational facilities. No law has ever been passed by the City Council stating that Negro and white citizens must use separate park facilities. On Sunday, July 11th at the Druid Hill clay tennis courts near Auchentoroly Terrace and Bryant Avenue (near the hot house) promptly at 2 P.M. Negro and white citizens are going to insist on their lawful rights to use these courts!

"Be present to lend your support!

"Sponsored by: The Young Progressives of Maryland

"328 N. Charles Street, Plaza 2470

"Henry Wallace Says: 'Jim Crow in America Has got To Go.' "

A number of indictments were found against the appellants here. Four (Collidge, Silverberg, Vestal and Swan) were indicted for violating the rule against disturbing the peace. Thirteen persons, including Askin and Winkler, two of the appellants, were indicted for

violating a rule of the Board by engaging in interracial activities after they had been notified of a prohibition against such action. These indictments were brought in on July 14, 1948. Subsequently, in September, 1948, 22 defendants, including all of the appellants, were indicted for riot and conspiracy. This was the indictment known as 3086. The first count charged riot and the fifth count charged that the defendants "unlawfully did conspire, combine, confederate and agree together and with each other unlawfully, riotously and tumultuously to assemble and gather together to disturb the peace." The parties charged were tried on this last indictment before Judge Moser sitting in the Criminal Court of Baltimore City without a jury, and the seven appellants, all of whom are white, were found guilty on the first and fifth counts. A motion for a new trial was made, and was heard before the Supreme Bench of Baltimore City. A new trial was granted on the first count, and denied on the fifth count. Seven judges concurred in this action, and two dissented. Thereafter the seven appellants were sentenced to various terms in the House of Correction, and were fined, the sentences were suspended and they were placed on probation for two years. From these judgments, the appeal is taken here.

The defendants filed demurrers to the indictments and also a motion to quash. The only count on which defendants were sentenced was the fifth. That clearly charges a common law offense, that is a conspiracy to commit a crime. *State v. Buchanan,* 5 H. & J. 317, 9 Am. Dec. 534; *Wharton's Criminal Law,* Vol. 2, Sections 1610 and 1620; Code 1947 Supplement, Article 27, Section 128. The other questions raised in the demurrers referred to the other indictments, which were not tried.

The motion to quash charged that the indictments were vague and also that they were improperly found because a stenographer or court reporter was in the grand jury room at the time of taking of testimony. We are unable to agree that count five is vague. With re-

spect to the other contention, there is a local statute, Chapter 668 of the Acts of 1945, which authorizes the appointment of a stenographer for the purpose of taking and transcribing testimony before the grand jury in Baltimore City. The predecessor of this statute was referred to by this court in the case of *Coblentz v. State*, 164 Md. 558, 166 A. 45, 88 A. L. R. 886, in which an indictment was held invalid because a special prosecutor was in the grand jury room. The Court, in that case, clearly indicated that a stenographer could lawfully, under a statute, be in the grand jury room. We see no constitutional objection to such a statute.

The motion in arrest of judgment, besides being based on the grounds set out in the demurrer and in the motion to quash, is based upon four other grounds. First a variance between the indictments and the proof, second irregularity in the conduct of the trial, third an alleged prejudicial exercise of the trial court's discretion in permitting the State to try a subsequent series of indictments charging conspiracy and riot, rather than the earlier indictments charging alleged violation of rules and policy of the Board of Recreation and Parks, and fourth, alleged prejudicial error made by the Court in refusing to enter a "not guilty" verdict after the State had entered a *nolle pros* in these earlier indictments.

Motions in arrest of judgment are confined to substantial errors, intrinsic in the pleadings or the verdict, and apparent on the face of the record which cannot be the subject of a demurrer. *Simmons v. State*, 165 Md. 155, 167 A. 60. The first of the contentions cannot be raised on such a motion. *Willie v. State*, 153 Md. 613, 139 A. 289. The second is an attempt to show collusion and consultation among the witnesses for the State, because, after some of the officers who had testified left the court room, they talked to other officers who were to testify, and were asked by the latter what questions were asked them. This is not the kind of error which can be reached by a motion in arrest of judgment. In any event, we do not think that the facts indicate col-

lusion. The third contention was brought about by an earnest effort made by appellants at the outset of the case to have the court try the indictments for violation of the park rules before the other indictments were tried. The State selected the other indictments to be tried first. It is usual in criminal cases to permit the State to select the indictments on which defendants are to be tried, in case there are several charges, and while the Court may direct the State to proceed on some specific indictment, that is a matter largely within the discretion of the trial court, and is not subject to review unless there is an abuse of this discretion. If we could consider this question on a motion in arrest of judgment, we would be unable to find that the trial court abused its discretion by not directing the State's·Attorney to proceed on the earlier indictments rather than the later ones. The State may have come to the conclusion that it could not convict on the indictments charging the violation of rules, but that it had sufficient evidence to convict on the charges of riot and conspiracy to promote disorder. The Court could not go into this in advance. We see nothing that is irregular or improper in the Court's action in permitting the State, at the outset of the case, to select the charges .on which it preferred to try the defendants. The fourth contention refers to indictments which were not tried, and the question raised is not before us in this case.

These are all the adverse rulings below, except the verdicts and judgments and the ruling of the Supreme Bench on the motion for a new trial. Rulings on motions for a new trial are not appealable unless there is an abuse of discretion, (*Snyder v. Cearfoss*, 186 Md. 360, 46 A. 2d 607), which we do not find, and we are, therefore, confronted with the final and real contention of the appellants, which is that the verdicts and sentences in this case constitute a violation of their rights of peaceable assembly and freedom of speech under the First Amendment to the Constitution of the United States. To pass upon this question, as urged by the appellants,

it will be necessary to examine the entire record, including the testimony.

By Article 15, Section 5 of the Constitution of this State, it is provided that in the trial of all criminal cases, the jury shall be the judges of law as well as of fact. In the case of *League v. State*, 36 Md. 257, it was held that when a person indicted elects to try his case before the Court without a jury, the court is substituted for the jury and has the same duties and functions to perform in passing upon the guilt or innocence of the accused. It has become firmly established in our law since the decision in the League case, that where a criminal case is tried before the court, no question of sufficiency of evidence can be raised on appeal because the position of a judge, in such a case, is analogous to that of a jury and he is, therefore, the final judge of both the law and the fact. *Folb v. State*, 169 Md. 209, 181 A. 225; *Berger v. State*, 179 Md. 410, 20 A. 2d 146; *Meyerson v. State*, 181 Md. 105, 28 A. 2d 833; *Smith v. State*, 182 Md. 176, 32 A. 2d 863; *Bright v. State*, 183 Md. 308, 38 A. 2d 96; *Peters and Demby v. State*, 187 Md. 7, 48 A. 2d 586; *Abbott v. State*, 188 Md. 310, 52 A. 2d 489; *Davis v. State*, 189 Md. 269, 55 A. 2d 702; *Hill v. State*, 190 Md. 698, 59 A. 2d 630; *Swann v. State*, 192 Md. 9, 63 A. 2d 324; *Slansky v. State*, 192 Md. 94, 63 A. 2d 599. Since the appellants were tried before the court and convicted on a charge of conspiracy to disturb the peace, the state earnestly contends that under these decisions we have no power to review the question whether or not their convictions were justified. That, in an ordinary case, is clearly the law.

The appellants, however, contend that as a result of their political and social beliefs they determined to test the validity of the policy of the Board of Recreation and Parks to prohibit interracial tennis games in Druid Hill Park. They claim they had a right to play such games, and they went to the Park to assert such right. They contend that the leaflets distributed and the arrangements made to have a number of people present to see

the test were not in furtherance of any desire or conspiracy to disturb the peace or to promote disorder. The intention was to play the games, let the participants be arrested and on their trial, the constitutional question they raised might be tested. They say that the testimony clearly and indisputedly shows that was what they did, and all that they did, that here was no disorder, except some sporadic incidents after the games had been broken up by the arrest of the players, and that the charges laid at first by the state were for violation of the rules and policy of the Board of Recreation and Parks, that subsequently the charges of riot and conspiracy were brought and the State insisted on trying these charges because it knew the difficulties of convicting on the earlier charges. They contend that the testimony in the case shows no evidence whatever of any conspiracy on their part to do anything but to exercise their lawful rights. That they had the right of peaceable assembly and of free speech under the First Amendment to the Constitution of the United States, that these rights were destroyed by the proceedings taken by the State and by appellants' conviction on a charge which has no evidence whatsoever to support it. They contend that as the courts are sworn to uphold the Constitution of the United States, they must take notice of this situation.

We think it is clear that no question as to the right to play interracial tennis matches is before us in this case. We may assume, without deciding, as the trial court seems to have assumed, that, in the absence of a statute, ordinance or rule, the alleged "policy" of the Park Board was wholly invalid, and that the initial arrests of the appellants were illegal and deprived them of their civil rights under the First and Fourteenth Amendments. If so, other remedies are open to them. But it can hardly be contended that the appellants had a constitutional right to be tried on those charges, when the State elected to abandon them and proceed on the subsequent indictment for conspiracy to disturb the

peace. That indictment was regular on its face and would permit proof of unlawful acts concurrent with, or in excess of, the lawful assertion of civil rights. The case was tried upon the theory, as stated by the trial court, that "illegal means were taken by a group * * * to rectify a just grievance * * * an illegal attempt to have that grievance remedied."

The appellants do not deny that in the ordinary case we are precluded by our prior decisions from examining the evidence to determine its legal sufficiency to support a criminal charge. They argue, however, that an exception must be made if it is affirmatively shown in any case that the trial was so unfair as to amount to a denial of due process under the Fourteenth Amendment. We have recognized this principle. In *Raymond v. State ex rel. Szydlouski*, 192 Md. 602, 65 A. 2d 285, 288, the unfairness found was the failure to appoint counsel under the circumstances, and, although no direct appeal was taken, on appeal in a *habeas corpus* case we set aside the judgment of conviction. On the other hand, we have held that the mere fact that, under established Maryland procedure, this court does not pass on the sufficiency of evidence to convict, but leaves that question to the determination of the trial court, or the Supreme Bench in Baltimore City, on motion for new trial, does not of itself render a trial unfair and a judgment void, within the meaning of the Fourteenth Amendment. *Peters and Demby v. State*, 187 Md. 7, 16, 21, 48 A. 2d 586; *Slansky v. State*, 192 Md. 94, 63 A. 2d 599.

The question is whether such unfairness is affirmatively shown in the case at bar so as to justify us in declaring the judgment a nullity. We think there is no such showing. On the contrary, we think the record shows that the trial judge, and a majority of the judges on the Supreme Bench who reviewed the evidence, acted in good faith and in the exercise of an honest judgment, even if we were disposed to disagree with their conclusion. The mere existence of error, open to review in another forum, does not amount to a deprivation of

constitutional rights. In the absence of controlling decisions by the Supreme Court, we should be slow to hold that in any case where a trial court, in arriving at a verdict, misconstrues the law or errs in a finding that the facts justify a conviction, we are compelled to extend the scope of review. Claims of unfairness in the result might be raised in any case.

In *Foster v. Illinois,* 332 U. S. 134, 67 S. Ct. 1716, 1719, 91 L. Ed. 1955, 1959, the Supreme Court said that claims of denial of due process "must be raised by whatever procedure Illinois may provide, or, in default of relief by appropriate Illinois procedure, by a new claim of denial of due process for want of such relief." In *Fay v. New York,* 332 U. S. 261, 67 S. Ct. 1613, 1630, 91 L. Ed. 2043, 2063, it is stated "But beyond requiring conformity to standards of fundamental fairness that have won legal recognition, this Court always has been careful not so to interpret this Amendment as to impose uniform procedures upon the several states whose legal systems stem from diverse sources of law and reflect different historical influences." And in *Bute v. Illinois,* 333 U. S. 640, 68 S. Ct. 763, 768, 92 L. Ed. 986, 991, the Court said "The Fourteenth Amendment, however, does not say that no state shall deprive any person of liberty without following the *federal* process of law as prescribed for the federal courts in comparable federal cases" and "This clause in the Fourteenth Amendment leaves room for much of the freedom which, under the Constitution of the United States and in accordance with its purposes, was originally reserved to the states for their exercise of their own police powers and for their control over the procedure to be followed in criminal trials in their respective courts."

The State of Maryland does not leave those convicted of a crime without a right to have a review of the evidence after conviction. That is provided by a motion for a new trial, and, in the case before us, that motion was heard by nine of the members of the Supreme Bench, *excluding the judge who heard the case.* The appellants

have exhausted this remedy, and, as we have shown, there is no provision of the Constitution of the United States as interpreted by the Supreme Court of the United States which holds that this is not sufficient. We conclude that the appellants have had their day in court, have had the evidence against them reviewed by the highest tribunal provided by this State for that purpose, and that, under our established practice, continuing over a period of many years, we should not re-examine that evidence upon the grounds urged upon us. The judgments will be affirmed.

*Judgments affirmed with costs.*

MARKELL, J. delivered the following dissenting opinion.

This case, appellants contend, is an attempt to convict them of crime, for exercising rights under the Constitution of the United States. The State in effect contends that, if this is true, then existing Maryland criminal procedure has put the facts as to exercise of constitutional rights in a sealed package, branded with a false label "conspiracy to assemble riotously to disturb the peace", and does not permit us to break the seal, but destroys our right and duty to prevent this violation of the constitution and to examine the facts as fully as necessary to this end.

The facts make it clear that appellants have been convicted for exercising their constitutional rights, *viz.,* (1) the right of equal protection of the laws and of personal liberty under the due process clause, to play interracial tennis on a public park tennis court, upon compliance with all formal requirements, in the absence of any valid segregation law, rule or regulation—or in this case any at all, and (2) the right of freedom of speech and of the press and the right of peaceable assembly, to invite attendance of others at the tennis tournament and to distribute the circular for that purpose. On July 11, 1948 a number of the tennis players (including two of the

appellants) and spectators (including four of the appellants) were arrested, and three days later indicted, for violating a rule and segregation "policy" of the Park Board. Buchman was not arrested or indicted. Later four of the appellants (not including Buchman) were indicted for violating a Park Board rule by disorderly conduct and by disturbing the peace. Two months after the arrests the State, evidently realizing that it could not obtain a conviction of violating a nonexistent segregation rule or a disembodied "policy", obtained another indictment of appellants (including Buchman) and fifteen other persons for riot and for conspiracy to assemble riotously to disturb the peace. As to appellants' constitutional right to play interracial tennis, the opinions of the judge at the trial and of the majority of the Supreme Bench on motion for new trial, apparently do not question—and the evidence does not warrant questioning— the statement and conclusion in the dissenting opinion of Judges Niles and Sherbow: "The basic fact is that there was no law, rule, or regulation of the Park Board prohibiting interracial tennis; there was only a minute in its records adopting a 'policy' of segregation. The defendants therefore in planning the tennis match did not conspire to commit an unlawful act, nor in playing tennis did they commit an unlawful act. * * * We do not question the right of the Park Board to make proper rules and regulations for the recreational facilities in the parks; nor do we substitute our judgment for theirs. They had made no rule, and their own officials had issued permits to the players." Neither the "minute" referred to, nor its contents, were offered in evidence. On the contrary, the State's evidence shows that the segregation "policy" has not forbidden and does not forbid interracial athletics at the Stadium.

The opinions of the majority of the Supreme Bench and of the trial judge show that appellants were convicted for exercising not only one constitutional right, to play interracial tennis, but several constitutional rights, viz., the right to play interracial tennis and also

the right of freedom of speech and the press and the right of peaceable assembly, in distributing the circular and otherwise inviting attendance at the tennis tournament. In those opinions the burden of the condemnation of appellants was (*a*) distribution of the circular, (*b*) invitation of spectators, (*c*) exercise of the constitutional right by more than two players (one white, one colored), the minimum number, sufficient (if they were arrested) to furnish a basis for a judicial "test" of the right, and (*d*) the exercise of the right at all without first establishing it by suit for injunction or *mandamus*—all after "warning" that "trouble might arise from the gathering if they attempted to play tennis". Distribution of the circular was an exercise of the freedom of speech and the press and the right of peaceable assembly. The circular had no tendency to—much less showed any intention or created any "clear and present danger" of— "defiance of law and order" or assembly to disturb the peace. It does not incite to, or suggest, resort to force or violence but only legal or political action to a legal and political end. The fact that the purpose of assembling was political as well as recreational only emphasizes the right of peaceable assembly and freedom of speech and the press. This was not the first time political action was ever taken on a tennis court—as was known before the First Amendment was ratified or proposed.

A prohibition of breach of the peace cannot constitutionally be applied to cover speech which "stirs the public to anger, invites dispute, brings about a condition of unrest or creates a disturbance." *Terminiello v. Chicago*, 337 U. S. 1, 69 S. Ct. 894, 895. No one is under obligation to apply for an injunction against criminal prosecution—or for *mandamus* to compel recognition of a constitutional right. There is no right to such an injunction except in special circumstances of irreparable injury. The normal way to "test" such a disputed right is to exercise it and take the risk of criminal prosecution. *Beal v. Missouri Pacific R. Co.*, 312 U. S. 45, 49,

61 S. Ct. 418, 85 L. Ed. 577; *Douglas v. Jannette,* 319
U. S. 157, 63 S. Ct. 882, 87 L. Ed. 1324, 146 A. L. R. 81.
In *Thomas v. Collins,* 322 U. S. 516, 65 S. Ct. 315, 89
L. Ed. 430, exercise of freedom of speech was sustained
notwithstanding a previous injunction against it. As
Judges Niles and Sherbow say: "Submission to arrest
to test the validity of a law or regulation is a time-hon-
ored method. It was followed thirty years ago by pro-
ponents of Sunday amateur baseball. *Hiller v. State,*
124 Md. 385, 92 A. 842. See also the opinion of Judge
Sloan in *Local No. 36 etc. v. Mayor and City Council of
Cumberland* (14,392 Equity) decided October 19, 1938,
in the Circuit Court for Allegany County, involving an
ordinance relating to picketing, where the court held that
the validity of the law should be tested by submission to
arrest for its violation." A right that cannot be exercised
is not a right. A constitutional right that can be exer-
cised, by unpopular persons in an unpopular cause, not
at all or only in silence and in solitude, is a mockery of
the Constitution and of free government.

Notwithstanding general statements in the majority
opinion of the Supreme Bench, there was no actual dis-
order or disturbance of the peace—at least none that
could be recognized as such at a baseball game at the
Stadium. Most of the appellants did not participate in
any of the specific acts of so-called disorder mentioned
in the opinion. The Supreme Bench holds that there is
no evidence of riot because no one was terrified. No
one has been convicted or tried though four of the ap-
pellants were indicted, for disorderly conduct or dis-
turbing the peace. There is no evidence of "conspiracy
to assemble riotously to disturb the peace." As Judges
Niles and Sherbow say, "Nor do we believe that the
defendants conspired to commit a lawful act in an
unlawful manner. The tennis players and the specta-
tors acted in an orderly manner, and there was no dis-
turbance of any kind until the police came on the scene
and began making arrests. There was no order given

to the onlookers to disband. * * * Whether a cause be popular or unpopular the law remains the same. Viewed in its proper perspective we have here a group of persons who had permits to play tennis and who invited arrest to test the validity of a 'policy' they contended was invalid. The evidence does not, in our opinion, show that they were guilty of causing a riot, or of conspiracy to create a riot, or of conspiracy to disturb the public peace or act in a disorderly manner".

The charge of conspiracy is a sham, belatedly devised to obtain and cover a conviction for exercising constitutional rights.

This court has held, too frequently and too recently to require citation of instances, that under existing Maryland criminal procedure it cannot review on appeal either the weight or the legal sufficiency of the evidence of guilt. In *Slansky v. State*, 192 Md. 94, 63 A. 2d 599, it was held that this procedure in itself is not a denial of due process under the Fourteenth Amendment, *i.e.*, is not lacking in any of the fundamentals of a fair trial which are essentials of due process. The Supreme Court has never held otherwise. Slansky had been convicted of bigamy. He contended that he had been deprived of two rights under the Constitution of the United States, (1) the right to a fair trial under the due process clause and (2) the right to marry in Maryland under the full faith and credit clause and a Nevada divorce decree. Slansky did not testify, but rested his defense on the Nevada decree. The decree did not recite personal service on the wife in Nevada or appearance by her, but recited a finding that Slansky was "a *bona fide* resident." Testimony of the wife at the Maryland trial, including a letter received by her from Slansky from Reno, was amply sufficient, not to say conclusive, to overcome the *prima facie* showing of jurisdiction in the decree itself. This court, reviewing the recitals in the decree and the other evidence just referred to, held that the jury "were entitled to find, as they did," that Slansky "did not acquire domicil

in Nevada, and therefore the Nevada court lacked the power" to make its decree binding in Maryland. This court concluded, "As we have found nothing in the record in this case to show that appellant was denied any right guaranteed by the Constitution of the United States, the judgment of conviction will be affirmed". 192 Md. 94, 111, 63 A. 2d 606.

The State contends that what this court actually did in the *Slansky* case, *viz.*, examine the record to find whether the defendant had been convicted for exercising a constitutional right or for committing a criminal wrong, this court now cannot do, but must shut its eyes to the facts and blindly affirm a judgment of conviction for exercising constitutional rights.

When, as applied to a particular case, state procedure, not in itself invalid, comes into collision with the Constitution of the United States, which must yield to the other? The State answers, That authority which is supreme must yield to that over which it is supreme. The Constitution answers, That which is not supreme must yield to that which is supreme. *McCulloch v. Maryland*, 4 Wheat. 316, 426, 4 L. Ed. 579.

The answer of the Constitution is the answer of the Supreme Court in every field of conflict, in none more clearly than in matters of state procedure and review of facts. The situation with respect to these matters was not always clear. The State of Virginia long and bitterly denied the right of the Supreme Court on writ of error to review state court decisions at all. *Cohens v. Virginia*, 6 Wheat. 264, 5 L. Ed. 257. In *Martin v. Hunter*, 1 Wheat. 304, 4 L. Ed. 97, the Supreme Court of Virginia refused to obey the mandate of reversal on the first writ of error. After the South Carolina Ordinance of Nullification had declared it unlawful for officers of the United States to collect customs duties in South Carolina, Congress by the Act of 1833 authorized removal, from a state court to a federal court, of any prosecution against an officer of the United States for

any act done under the customs revenue laws of the United States. A similar act of 1815 had been in force for six years. This right of removal was extended in 1864 and 1866 to internal revenue officers and later to prohibition agents. This legislation reflects no doubt as to the right or scope of review on writ of error, but determination to protect United States officers against local prejudice from the beginning, not only at the end, of a prosecution for performing their duties. *State of Tennessee v. Davis*, 100 U. S. 257, 25 L. Ed. 648; *State of Maryland v. Soper*, 270 U. S. 9, 46 S. Ct. 185, 70 L. Ed. 449. At common law facts were not reviewable on writ of error. For many years the Supreme Court followed the general rule that on writ of error (to state or federal courts) only questions of law, not facts, are reviewed. As law itself became more factual, the distinction between law and fact less clear, and the art of hiding questions of law in questions of fact more advanced, an exception to the general rule was recognized when it was necessary to review facts in order to decide a question of law. Eventually the exception outgrew the rule. In 1928 writs of error were abolished and appeals substituted, but (except in name) differences between writ of error and appeal had already disappeared.

In *Cresswill v. Grand Lodge Knights of Pythias*, 225 U. S. 246, 261, 32 S. Ct. 822, 827, 56 L. Ed. 1074, the court, by Chief Justice White, stated, as "propositions which are as well settled as the rule itself," "that where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to cause it to be essentially necessary, for the purpose of passing upon the Federal question, to analyze and dissect the facts, to the extent necessary to do so the power exists as a necessary incident to a decision upon the claim of denial of the Federal right." Twenty-two years later in *Norris v. Alabama*, 294 U. S. 587, 590, 55 S. Ct. 579, 580, 79 L. Ed. 1074 the court, by Chief Justice Hughes, citing the Cresswill case and later cases, restated this proposition somewhat more broadly and generally: "When a federal right has been

specially set up and claimed in a state court, it is our province to inquire not merely whether it was denied in express terms but also whether it was denied in substance and effect. If this requires an examination of evidence, that examination must be made. Otherwise, review by this Court would fail of its purpose in safeguarding constitutional rights. Thus, whenever a conclusion of law of a state court as to a federal right and findings of fact are so intermingled that the latter control the former, it is incumbent upon us to analyze the facts in order that the appropriate enforcement of the federal right may be assured." The performance of the duty to make that examination of evidence "cannot be foreclosed by the finding of a court, or the verdict of a jury, or both." *Lisenba v. California,* 314 U. S. 219, 237-238, 62 S. Ct. 280, 290, 86 L. Ed. 166; *Ashcraft v. Tennessee,* 322 U. S. 143, 147-148, 64 S. Ct. 921, 88 L. Ed. 1192. A state court of general jurisdiction cannot refuse to entertain a suit under an act of Congress, *Second Employees Liability Cases (Mondou v. New York, N. H. & H. R. Co.),* 223 U. S. 1, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A., N. S., 44; *Lambros v. Brown,* 184 Md. 350, 41 A. 2d 78, but in the trial of such a case in a state court, "the kind or amount of evidence required to establish it [*e.g.,* to take it to the jury] is not subject to the control of the several states." *Chicago, M. & St. P. Ry. Co. v. Coogan,* 271 U. S. 474, 478, 46 S. Ct. 564, 565, 70 L. Ed. 1041. In such cases state courts should not follow the views of the state supreme court rather than those of the United States Supreme Court. *Chesapeake & Ohio Ry. Co. v. Kuhn,* 284 U. S. 44, 47, 52 S. Ct. 45, 76 L. Ed. 157. A state *"Prima Facie* Act" cannot be applied to such a case. *New Orleans & N. E. R. R. Co. v. Harris,* 247 U. S. 367, 370-371, 38 S. Ct. 535, 62 L. Ed. 1167; *New Orleans & N. E. R. R. Co. v. Scarlet,* 249 U. S. 528, 529-530, 39 S. Ct. 369, 63 L. Ed. 752.

In *Davis v. Wechsler,* 263 U. S. 22, 24-25, 44 S. Ct. 13, 14, 68 L. Ed. 143 (cited in *Norris v. Alabama, supra),* the court, by Mr. Justice Holmes, gave the answer of the

Constitution with respect to conflicts with state procedure: "Whatever springs the State may set for those who are endeavoring to assert rights that the State confers, the assertion of Federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice. * * * The state courts may deal with that as they think proper in local matters but they cannot treat it as defeating a plain assertion of Federal right. The principle is general and necessary. *Ward v. Love County*, 253 U. S. 17, 22, 40 S. Ct. 419, 64 L. Ed. 751. If the Constitution and laws of the United States are to be enforced, this Court cannot accept as final the decision of the state tribunal as to what are the facts alleged to give rise to the right or to bar the assertion of it even upon local grounds. *Cresswill v. Grand Lodge Knights of Pythias*, 225 U. S. 246, 32 S. Ct. 822, 56 L. Ed. 1074. This is familiar as to the substantive law and for the same reasons it is necessary to see that local practice shall not be allowed to put unreasonable obstacles in the way."

It is not suggested in the opinion of this court, but seems to be implied in some of the reasoning, that though the Supreme Court can and must obey the Constitution and, so far as necessary, examine the facts and the evidence to that end, this court cannot and should not do so. Such a suggestion could hardly be taken seriously. Any court or judge charged with the duty of administering justice under law necessarily has power (until checked) to do injustice in disregard of law. But might is not right. By Article VI of the Constitution of the United States and Article 2 of the Maryland Declaration of Rights, and by his oath of office, every judge of this state is obligated to support the Constitution of the United States and is bound thereby, "anything in the Constitution or Laws of this State to the contrary notwithstanding." In this respect the obligations of every state judge and every federal judge are the same. Such defiance of the Constitution would be demoralizing and also, in its logical and practical results, would be absurd

and futile. If this court cannot, but the Supreme Court can and must, examine the facts in order to support the Constitution, then after such a reversal by the Supreme Court and a second conviction this court would again be similarly impotent and the Supreme Court would be forced to compel compliance. *Martin v. Hunter's Lessee,* 1 Wheat. 304, 4 L. Ed. 97. If it be said that trial judges or juries would not defy the Supreme Court by a second conviction, this court would be put in the still more ridiculous position of claiming an exclusive right to violate the Constitution and trusting the Supreme Court and the trial judges to perform the duty that we refuse to perform.

The opinion of this court adopts the State's contention *in toto* without discussing the real constitutional question involved and without giving adequate recognition to the differences between state and federal rights, between different federal rights and between rights and remedies. The main theme is (*a*) reiteration of what was decided in the *Slansky* case and is not questioned in the instant case, *viz.*, that existing Maryland criminal procedure, anomalous as it is, is not *per se* lacking in such fundamentals of a fair trial as are essentials of due process and (*b*) insistence upon the "fairness" of appellants' trial. It is said that no "such unfairness is affirmatively shown * * * as to justify us in declaring the judgment a nullity"; that "the trial judge, and a majority of the judges of the Supreme Bench who reviewed the evidence, acted in good faith and in the exercise of an honest judgment, even if we were disposed to disagree with their conclusion"; that "the mere existence of error, open to review in another forum [?], does not amount to a deprivation of constitutional rights". On direct appeal from a judgment of conviction, not a proceeding to set aside a judgment, valid on its face, long after expiration of time for appeal (*Foster v. Illinois,* 332 U. S. 134, 67 S. Ct. 1716, 91 L. Ed. 1955), there is no occasion to declare the judgment "void" and "a nullity". Manifestly, "the mere existence of error does

amount to a deprivation of constitutional rights", when the error itself is deprivation of constitutional rights by conviction of crime for exercising them. There is no such thing as a "fair" method of depriving a person of constitutional rights, even if it is done "in good faith and in the exercise of an honest judgment." A conviction in violation of constitutional rights cannot stand, "whether accomplished ingeniously or ingenuously". *Smith v. Texas,* 311 U. S. 128, 132, 61 S. Ct. 164, 166, 85 L. Ed. 84; *Patton v. Mississippi,* 332 U. S. 463, 465-466, 68 S. Ct. 184, 92 L. Ed. 76, 1 A. L. R. 2d 1286.

It has been suggested, in justification of appellants' conviction, that nothing could be more serious than deprivation of life and that by good old Maryland practice men are hanged without review, on appeal, of the weight or sufficiency of the evidence of guilt. Murder and rape are not constitutional rights—though conviction of a federal officer of murder, for a lawful killing in the necessary performance of his duty, would be a violation of his constitutional rights. *Tennessee v. Davis, supra; Maryland v. Soper, supra.* As long as Maryland does not take the possibility of hanging a man without evidence seriously enough to give the same review on appeal in a capital case as it gives in a $101 civil case, the Constitution of the United States would not prevent Maryland from trying capital cases before a justice of the peace (with a jury, when desired) with no appeal at all. In that event the justice of the peace would be bound, just as this court now is bound, by the Constitution of the United States, and the accused would have the same right of review by the Supreme Court of the decision of the justice of the peace as it now has in respect of a decision of this court. The Supreme Court may review, on appeal or *certiorari,* only "final judgments or decrees rendered by the highest court of a State in which a decision could be had." 28 U. S. C. A. § 1257, Act of 1948, former Judicial Code, § 237, (*a*) (*b*). So far as the Constitution of the United States is concerned, Maryland need not provide any appeal at all. But if and

when it does provide an appeal, the appellate court and judges, like all other Maryland courts and judges, are bound by the Constitution of the United States, "anything in the Constitution or Laws of this State to the contrary notwithstanding." Declaration of Rights, art. 2. Maryland cannot exempt them from this obligation.

In the opinion of this court *Foster v. Illinois*, 332 U. S. 134, 67 S. Ct. 1716, 1719, 91 L. Ed. 1955, is quoted as holding that claims of denial of due process "must be raised by whatever procedure Illinois may provide, or, in default of relief by appropriate Illinois proceedings, by a new claim of denial of due process for want of such relief." The *Foster* case was "an original proceeding in the Supreme Court of Illinois by way of writ of error to test the validity of sentences of imprisonment following pleas of guilty." Eleven years after sentence the petittioners asked the Supreme Court of Illinois for their discharge, claiming denial of due process in that they did not have the benefit of counsel. *Raymond v. State*, 192 Md. 602, 65 A. 2d 285, was a similar proceeding by *habeas corpus*. In the instant case appellants are not suing to annul a judgment, valid on its face and ripe with years. They are haled into court, charged with crime. They are not seeking a judicial remedy but are asserting their constitutional rights in defense of the charge.

The judgments should be reversed.

It is to be regretted that Maryland should add to the list of cases in various states (many of them involving racial matters) in which a prosecution has succeeded, against law and justice, by manipulation of procedural devices, in attaining conviction and escaping correction in the state courts.