## BROWN *v.* STATE

[No. 156, September Term, 1964.]

494

*Decided February 10, 1965.*

The cause originally was argued before Hammond, Horney, Marbury, Sybert and Oppenheimer, JJ., and reargued before Prescott, C. J., and Hammond, Horney, Marbury, Sy-

BERT and OPPENHEIMER, JJ., and CLAPP, J., Associate Judge of the Sixth Judicial Circuit, specially assigned.

*Charles P. Howard, Jr.* (on both arguments) for the appellant.

*Stuart H. Rome, Assistant Attorney General* (on both arguments), with whom were *Thomas B. Finan, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Frank Cannizzaro, Jr., Assistant State's Attorney,* on the brief, for the appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

The appellant, Brown, was convicted of first degree murder in the Criminal Court of Baltimore by Judge Harris, sitting without a jury. First sentenced to life imprisonment, the sentence was "stricken" or "suspended" in order to enable him to file a motion for a new trial. Brown's motion for a new trial was filed but later withdrawn. He was then sentenced to death. In this appeal from that judgment, the appellant contends first, that the trial court erred in failing to grant a motion for a directed verdict of acquittal of murder in the first degree; second, that the appellant's representation by his trial counsel was so inadequate as to amount to a denial of due process of law; and, third, that the death sentence was illegally imposed. We shall consider these contentions in the order named.

I

The evidence is uncontradicted that Brown and the deceased, Geraldine Vandervall, had been living together for several years. She left him and with her three children, one of whom was Brown's, moved to her mother's home, in Baltimore City. Patricia Bell, a cousin of the deceased, testified that, about a month before the tragedy, she had heard Brown threaten to kill Geraldine if she left him. On the night of September 11, 1963, Brown came to the home of Patricia Bell, on North Avenue, west of Longwood Street, where Geraldine had been spending much of her time. Patricia Bell and her sister, Dorothea Brad-

ley, testified that Brown angrily demanded to see Geraldine; both girls told him Geraldine was not there and that they did not know where she could be found. Brown left and continued his search for Geraldine, visiting the nearby homes of several of her neighbors. In the meantime, Geraldine had arrived at her cousin's North Avenue house. Patricia Bell saw Brown return to his car, which he had parked on North Avenue, and Patricia told Geraldine of Brown's return. Geraldine, according to Patricia, said she did not want to talk with Brown but thought she should "get it over with now." Patricia said Geraldine stepped outside and called Brown's name. Brown said he wanted to talk with her and drove around the corner to Longwood Street with Geraldine following on foot. The two then engaged in conversation; Patricia could only see the rear of Brown's car. Patricia, concerned about her cousin, walked around the corner several times, but, on each occasion, the couple stopped speaking as Patricia came into sight. Patricia observed Brown seated in the car with the door open and his feet on the curb; Geraldine was standing before him on the sidewalk. After her second expedition, Patricia returned to her house and sat on the front steps. Shortly thereafter, she heard a man at the corner say, "Miss, is you all right?" Patricia ran to the corner and found Geraldine in the gutter, her eye gouged and her body bloodied. Brown's car was still there, with the door open, but Brown had fled. The police were called and took Geraldine to a hospital. She was dead on arrival. She was a slight woman, five feet one inch in height and only eighty-nine pounds in weight. The autopsy report shows she died of multiple stab wounds of the face, head, neck, back, upper body and abdomen. Brown voluntarily surrendered to the police later the same night.

Brown chose not to take the stand in his own defense. The only evidence as to what took place between Brown and Geraldine immediately before her death is contained in Brown's unsigned confession. No contention was made at the trial, or is made on this appeal, that the confession was involuntary. Brown's trial counsel (who is not counsel in this appeal) stated Brown said he gave the statement voluntarily, and, at the trial, on a question from the court, Brown said this was correct. Sergeant Albert Thomas, to whom Brown gave his statement, testified Brown said, in part:

"[A]s he saw Geraldine come out of Patsy's house he pulled around the corner and stopped and Geraldine came down and she got in the car and we were talking. He said first she was standing on the sidewalk and I was talking to her with the right door open. Then he got out, stood on the sidewalk and she got in the car. When I asked if she was going home with me, and she said, no, so I told her to get out of the car so I could go and she said she wasn't finished talking and I told her; he said he told her he didn't have any more to say. She didn't get out of the car so he reached in, grabbed her, tried to pull her out and she pulled the door shut. She tried to get the window up and he got inside the window and he said she found a screwdriver on the seat of the car. He said he took the screwdriver away from her and he hit her with it. He said he hit her with the screwdriver. * * * 'She told me I hurt her', and he said he hit her again. He said, 'I will kill you,' and he said he kept on hitting her and she was trying to get out of the other side of the car and she was hollering, and 'The last time I hit her I saw blood on my hand.' Then he dropped the screwdriver and ran down to his brother's house at 1719 Moreland Avenue."

The scope of our review as to the sufficiency of the evidence to sustain the conviction of murder in the first degree is not to determine whether the State has proved its case beyond a reasonable doubt, but whether there was sufficient relevant evidence properly before the trier of the facts to sustain the conviction. *Sample v. State,* 235 Md. 554, 201 A. 2d 797 (1964); *Tull v. State,* 230 Md. 596, 604, 188 A. 2d 150 (1963); *Lee v. State,* 224 Md. 260, 167 A. 2d 595 (1961) and cases therein cited. In this case, there was testimony as to Brown's threat to kill his paramour, uttered several weeks before the slaying. He admitted using the screwdriver to inflict repeated blows upon his victim; he confessed that he hit her again when she said he had hurt her and told her "I will kill you." The fact that the screwdriver was not found and apparently had not

been on Brown's person before the crime and Brown's statements that the slightly built woman he killed had tried to keep him out of the car and that it was she who had picked up the screwdriver, were for the trial judge's consideration in arriving at his verdict. It was for the judge to determine whether the State had proved first degree murder beyond a reasonable doubt. There was ample evidence to sustain the court's finding.

## II

The record does not show Brown ever complained of his representation at his trial in the court below or thereafter, before this appeal. The point can not be raised for the first time here. Maryland Rule 885, *Stevens v. State,* 230 Md. 47, 185 A. 2d 194 (1962).

In any event, however, the complaint of inadequate counsel is not supported in the transcript of the record of the trial. Some testimony was admitted without objection when objections might have been made, but the adequacy of counsel is not to be measured by the number of his objections. An attorney may deem it expedient, in his client's interests, not to risk emphasizing adverse testimony. Even though, on hindsight, a decision may seem unwise, mere error in trial tactics does not amount, *per se,* to inadequate representation. *Greene v. State,* 233 Md. 274, 196 A. 2d 454 (1964); *Stevens v. State, supra.*

Browns' trial counsel was vigorous in cross-examination. The fact that he produced no defense witnesses does not prove inadequacy; there may have been none. Brown elected not to take the stand. Often, where the State's case is strong, experienced trial counsel direct their principal efforts to the mitigation of sentence. In this case, the sentence originally imposed was less than the maximum permitted by law.

## III

Determination of the question of whether, on the facts, the increase of the life sentence originally imposed to capital punishment was illegal, requires an examination of the place of motions for new trials in criminal cases in Baltimore City and the procedure in respect thereto.

Absent State constitutional or statutory requirements, the

right to file a motion for a new trial after conviction for a criminal offense is not guaranteed under the due process clause. There is no right, under that clause, even to an appeal. *Griffin v. Illinois,* 351 U.S. 12, 18 (1956) ; *Winkler v. State,* 194 Md. 1, 16-17, 69 A. 2d 674 (1949) and cases therein cited. In Maryland, before the adoption of the amendment to Section 5 of Article XV of our Constitution, this Court did not have the power to review the legal sufficiency of the evidence to sustain a conviction. *Giles v. State,* 229 Md. 370, 384, 183 A. 2d 359 (1962) ; *Slansky v. State,* 192 Md. 94, 63 A. 2d 599 (1949).

However, Section 33 of Article IV of the Maryland Constitution provides that the Supreme Bench of Baltimore City shall have jurisdiction to hear and determine all motions for a new trial in cases tried in any of its courts where such motions arise either on questions of fact or for instruction upon any matters of law, and that the Supreme Bench shall make all needful rules and regulations for the hearing before it of all of said matters. Code (1957) Article 27, Section 594 provides, *inter alia,* that all motions for new trials in criminal cases in Baltimore City shall be heard by the Supreme Bench. In *Johnson v. State,* 219 Md. 481, 150 A. 2d 446 (1959), Judge Prescott, for the Court, pointed out that this constitutionally granted power to hear motions for new trials is unusual, if not unique. Judge Prescott said:

> "[T]hat one of the purposes of the procedure contemplated by the constitution is to seek uniformity of decision and provide a forum where there can be had the benefit of review in cases where an appeal will not lie. Often, where an appeal does lie the powers of review of the Supreme Bench in ruling upon the motion for a new trial are broader in scope than those of this Court. It may weigh the evidence in a criminal case even though the case was tried before a jury, and grant a new trial in its sound discretion. It also has the authority to weigh and consider newly discovered evidence. The opportunity to seek a setting aside of his conviction before the Supreme Bench is a valuable one which appellant was denied solely because of lack of funds." 219 Md. at 483.

See also *Williams v. State,* 204 Md. 55, 67, 102 A. 2d 714 (1954). It was held in *Johnson* that under *Griffin v. Illinois, supra,* an indigent defendant, convicted in a criminal court in Baltimore City, must be furnished a free transcript of the testimony if he requests it in seeking a new trial as long as the Supreme Bench will not hear such motions without a transcript.

Rule 747 of the Rules of the Supreme Bench of Baltimore City (1961) reads as follows:

> "Every motion for a new trial or in arrest of judgment in criminal cases shall be filed before the official closing hour of the clerk's office on the third day succeeding that upon which the verdict shall have been rendered, but in no event shall such motion be filed after the court shall have imposed sentence, unless the defendant at the time the verdict is rendered requests the court to suspend sentence pending the filing of a motion for a new trial or in arrest of judgment.

> "The computation of time for filing a motion under this Rule shall be in accordance with Md. Rule 8.

> "All reasons for a motion shall be filed within the time limited for filing the motion, and no other reason shall be assigned thereafter without leave of the court." [1]

Maryland Rule 764 b provides:

> "For a period of ninety (90) days after the imposi-

---

1. This rule is not contained in the record, but was agreed to be in effect at the time of trial by counsel for the State and the appellant. Indeed, both counsel argued in respect of its meaning and application. Moreover, one of the following rules of the Supreme Bench of Baltimore City, dealing with motions for new trials from the Criminal Court, was referred to by Chief Judge Sobeloff, for the Court, in *Williams v. State,* 204 Md. 55, 66, 102 A. 2d 714 (1954). Under these circumstances, this court may consider the rule an existing one of the Supreme Bench of Baltimore City. *Dembeck v. Bethlehem Shipbuilding Corp.,* 166 Md. 21, 29, 170 Atl. 158 (1934); *Taylor v. Denny,* 118 Md. 124, 126, 84 Atl. 369 (1912). See also *Tydon v. Spong,* 237 Md. 107, 205 A. 2d 220 (1964).

tion of a sentence, or within ninety (90) days after receipt by the court of a mandate issued by the Court of Appeals upon affirmance of the judgment or dismissal of appeal, or thereafter, pursuant to motion filed within such period, the court shall have revisory power and control over the judgment or other judicial act forming a part of the proceedings. The court may, pursuant to this section, modify or reduce, but shall not increase the length of a sentence. After the expiration of such period, the court shall have such revisory power and control only in case of fraud, mistake or irregularity."

Within this frame of constitutional and statutory provisions, decisions and rules of court, we turn to what happened to Brown.

After Judge Harris had rendered his verdict on December 12, 1963, he asked whether Brown wished sentence deferred or was ready for sentence. Brown's counsel said he believed his client was ready for sentence then. The following colloquy then occurred between the court, Mr. Cannizzaro, the Assistant State's Attorney who had tried the case for the State, and Mr. Manelli, Brown's trial counsel:

"(The Court) Is there any record?
(Mr. Cannizzaro) May 1952, disorderly conduct. On February 18th, 1960 he was released after serving five years for manslaughter, having been convicted October 11th, 1956 in Frederick County.
(The Court) Is that all he has?
(Mr. Cannizzaro) Yes sir.
(The Court) Brown, stand up. Is there anything you care to say prior to imposition of sentence?
(Mr. Brown) No, sir.
(The Court) I sentence you to prison for the rest of your natural life.
(Mr. Manelli) Your Honor, I would like to preserve the man's right for a motion for a new trial.
(The Court) If you wish to, I will have to strike out

the sentence. If you wish to give it further thought I will strike out the sentence.

(Mr. Manelli) On his request, I would like to consider it."

The clerk's docket entries of that day show only "Sentence deferred pending the filing of a Motion for a New Trial."

The motion was filed on December 16. On Brown's petition and affidavit to prosecute the motion as an indigent defendant, his present counsel was appointed by the court to represent him. On April 15, 1964, Brown, by his new counsel, withdrew his motion for a new trial. Thereafter, certain information came to the judge as to the details concerning Brown's manslaughter conviction referred to prior to the imposition of the life sentence on December 12, 1963.[2]

On May 20, 1964, over the objection of Brown's counsel, Judge Harris, after referring to the life sentence imposed on December 12, 1963, as a "complete nullity," sentenced Brown to death. This appeal is from the judgment entered on that sentence.

The issue presented is whether the life sentence imposed on Brown on December 12, 1963 was vacated or suspended. If it was vacated, absent any question of double jeopardy, it was a nullity, and the case stood as if no sentence had ever been entered. *State v. Butler,* 72 Md. 98, 18 Atl. 1105 (1890). If only the execution of the life sentence was suspended, the sentence could not thereafter be increased to a sentence of death. Maryland Rule 764 b.

As Rule 747 of the Supreme Bench of Baltimore City recognizes, while generally a defendant in a serious criminal case, or his counsel, immediately after a verdict of guilty, asks the judge to defer imposing sentence pending the filing of a motion for a new trial, and consideration thereof by the Supreme Bench,

---

2. No contention is made on this appeal that Brown and his counsel were not notified of the additional information which had come to the trial judge's attention, or were not given an opportunity to be heard in connection therewith. See *Costello v. State,* 237 Md. 464, and cases therein cited. The record affirmatively indicates that such notice and opportunity were given.

or pending consideration of whether or not such a motion will be filed, it is not unusual for the sentence to be imposed first and the request to invoke the rule to be made afterwards, within the three day period. Under such circumstances, the defendant may have been committed to the penal authorities and so have begun serving his sentence before the request is made. While the rule states that the request shall be made at the time the verdict is rendered, in practice, the rule is applied as to a request made at any time within the three day period.[3]

If a defendant has begun serving his sentence in a penal institution and is no longer in the custody of an officer of the court, as he is while awaiting sentence, his sentence can not thereafter be increased. Such an increase is double jeopardy, whether under the Fifth Amendment to the Federal Constitution, or, as in Maryland, under the common law. *United States v. Murray,* 275 U. S. 347, 358 (1928) ; *Ex parte Lange,* 85 U. S. 163 (1873). See *Czaplinski v. Warden,* 196 Md. 654, 658, 75 A. 2d 766 (1950). Cf. *Cisson v. United States,* 37 F. 2d 330 (4th Cir. 1930). See Wharton's *Criminal Law and Procedure* § 2191 (1957).

The meaning of the Supreme Bench rule is apposite, for it is evident that Brown's counsel meant to invoke it, however informally, after the imposition of the life sentence at the conclusion of the trial. That rule and its predecessors were promulgated under the mandate of Section 33 of Article IV of the Maryland Constitution. The constitutional and statutory intent to give defendants convicted of crimes in the Criminal Court of Baltimore the right to have questions of fact and law reviewed by the Supreme Bench of Baltimore City on a motion for a new trial is clear.[4]

The mere fact that sentence has been imposed has been declared by the Supreme Bench under its rule 747 not to con-

---

3. The practice and procedure referred to in the above paragraph were agreed to by counsel at argument, and are consonant with the knowledge of this Court.

4. The Supreme Bench of Baltimore City does not have power to review sentences. Recommendations in respect of appeal of sentences are under consideration by the Commission to Study Sentencing in Criminal Cases.

stitute a bar to the filing of a motion for a new trial. If the rule were construed to mean that the suspension of sentence referred to therein is equivalent to a vacating of the sentence, a convicted defendant might well hesitate to invoke his right to file the motion, for, if the new trial were denied, his sentence might be increased. Moreover, under such a construction, a convicted defendant who filed his motion on the third day after sentence might not be subject to an increase if his motion was denied because he had begun to serve his term and could invoke the protection against double jeopardy, while a defendant who filed his motion the day after the imposition of sentence would have no such safeguard. In framing its rule, the Supreme Bench may well have had these considerations of fairness in mind.

"To suspend" has been defined in various ways; among the definitions are "to postpone", and to "stay the execution"; "to stay, as a decree:—not synonymous with vacate" (Black's Law Dictionary, 4th ed.); "to make inoperative temporarily"; "to cease (for a time) from the execution or performance of" [The Oxford English Dictionary (1933)]. In *Stewart v. Oneal*, 237 F. 897 (6th Cir. 1916) in considering the effect of a statute that upon an appeal being taken the judgment or decree in the lower court shall be suspended, the Court of Appeals said: "Now 'vacate' and 'suspend' are not synonymous. Vacate means to annul, set aside, or render void; suspend, to stay. When a thing is vacated it is devitalized. It is not when suspended. It may be suspended, and yet retain its vitality." [5] 237 F. at 906.

The meaning of the Supreme Bench rule, however, in our opinion, does not depend upon the niceties of definition but upon the reasonable intendment of the language used in the light of the purpose to be effectuated. *Shub v. Simpson*, 196 Md. 177, 191, 76 A. 2d 332 (1950); *Darnall v. Connor*, 161 Md. 210, 214-16, 155 Atl. 894 (1931). The clear purpose of the

---

5. It was held that, under the statute, an appeal only suspended the decree vacating probate of a will, and the dismissal of the appeal, even though wrongful, could not have the effect of vacating the decree and leaving the will in force.

rule is to permit convicted defendants to invoke their important right to file a motion for a new trial, even though sentence has been imposed. A construction of the language used (the request "to suspend sentence pending the filing" of the motion) to mean only that the execution of the sentence is to be stayed pending the hearing on the motion would leave the defendant free to exercise his right, unhampered by the fear of increased sentence. If the rule were construed to mean that the sentence was to be vacated, a defendant's life, as here, might depend on whether he filed the motion the first or third permitted day. The Supreme Bench, in our judgment, did not intend to subject a defendant to such fears or vagaries of chance in the exercise of his right.

In view of these considerations, the use of the word "suspend" rather than "vacate" is particularly significant. Moreover, a sentence can hardly be "vacated" pending the filing of a motion for a new trial. If a sentence is vacated, it is a nullity, irrespective of time. Nor is it logical to read "suspend" as meaning "suspend the imposition of sentence" when the clause refers to a request made only after sentence has been imposed. The reasonable construction of the rule, in our opinion, is that on request the execution of the sentence which has been imposed is to be suspended.

The State argues that if the rule means that, on request, only the execution of the sentence is stayed pending the hearing on the motion, there would be a conflict between the time fixed for filing an appeal and the hearing on the motion by the Supreme Bench of Baltimore City. We do not agree. We have held that the filing of a motion for a new trial, after judgment and sentence, does not extend the time for the filing of an appeal which, under Maryland Rule 812 a, must be filed within thirty days from the date of the judgment appealed from. *Colter v. State*, 219 Md. 190, 148 A. 2d 561 (1959) ; *Hayes v. State*, 141 Md. 280, 118 Atl. 652 (1922). In those cases, however, there was no question as to whether the execution of the sentence had been stayed under a rule such as the one of the Supreme Bench here involved. In *Tiller v. Elfenbein*, 205 Md. 14, 21, 106 A. 2d 42 (1954), a civil case, we held that even after a judgment has been entered and an appeal taken therefrom, the trial court

retains its control over the judgment for such reasonable time as may serve the court's convenience in disposing of a motion for a new trial, but that, unless the appeal is dismissed when the motion comes on for hearing, the appellant must elect between his motion and his appeal.[6] In *Tiller* also, the operation of the judgment had not been stayed but we noted that in equity, the lower court has power to suspend the operation of a decree by special order passed before it becomes enrolled. 205 Md. at 17, citing *Hancock v. Stull,* 199 Md. 434, 86 A. 2d 734 (1952).

When the execution of a sentence is stayed under Supreme Bench Rule 747, there is, at that time, no final judgment from which an appeal will lie. *Hancock v. Stull, supra,* 199 Md. at 436-37; *Herbert v. Rowles,* 30 Md. 271 (1869). See also *Hanley v. Stulman,* 216 Md. 461, 466-68, 141 A. 2d 167 (1958). Under these circumstances, therefore, there is no conflict between the time fixed for filing the appeal and the hearing on the motion by the Supreme Bench of Baltimore City because there is no appealable judgment. If the motion for a new trial is withdrawn, or heard and denied, the suspension of the execution of the sentence is thereupon automatically terminated and the time for the taking of an appeal runs from that date.[7]

The report of the colloquy between Brown's trial counsel and the judge after the life sentence had been imposed is fragmented and unclear. It is evident, however, that Brown's counsel wished time to consider filing a motion for a new trial and that Judge Harris desired to give him the right to do so. The Supreme Bench rule provided a well-known means by which the desired

---

6. Under Maryland Rule 564 b 1, adopted after *Tiller,* in non-jury cases at law, the entering of a judgment *nisi* prevents the running of the time for filing an appeal until final judgment is entered.

7. Code (1957), Art. 5, § 13 which provides that in all criminal actions where sentence has been suspended by the court the defendant shall have the right to appeal to the Court of Appeals under § 12 of the Article, is not in conflict with our interpretation of the Supreme Bench Rule 747; that section of the Code refers to the suspension of the imposition of sentence, not to the suspension of its execution. See *Pearlman v. State,* 226 Md. 67, 172 A. 2d 395 (1961). The present case does not deal with the suspension of the imposition of a sentence.

result could be attained. There was no formal invocation of the rule, but such a formality was unnecessary.

When his counsel made the request, Brown was in no position to claim double jeopardy if his motion for a new trial was not filed, or filed and denied, or, as happened, filed and withdrawn and his sentence thereafter increased. However, if, as we believe, the sentence was supended under the rule, that rule can not have one meaning for one defendant and another meaning for another defendant. The proper interpretation of the rule is that, invoked, the execution of the sentence is suspended pending action on the motion for a new trial. Heinous as was Brown's crime, his sentence had been imposed and remained in effect, unless a new trial were granted. Under Maryland Rule 764 b, that sentence could not be increased.

The fact that the court's docket does not show the imposition of the sentence and its subsequent stay can not affect Brown's status. That status depended upon what had happened in open court, in his presence, not upon the clerk's interpretation thereof. The sentence should have been recorded and the stay of its execution noted. But the clerk's failure properly to interpret what had transpired can not alter the facts that a life sentence had been imposed, the rule invoked, and under it, only the execution of the sentence had been stayed.

Nor does the court's phrase "If you wish to give it further thought I will strike out the sentence" necessarily indicate the judge intended to vacate the sentence rather than to suspend it under the rule. The colloquy was informal. It is clear the judge was concerned with Brown's right to file the motion, rather than with the words in which that right was recognized. The distinction between suspension and vacating a judgment is not always recognized even in formal opinions. See *Stewart v. Oneal, supra.* The judge's recollection of the effect of what was said, some five months afterwards, when he had determined to increase the sentence to the death penalty, is not conclusive. The determination is to be made as of the time when the sentence was imposed. In view of all the circumstances, we think the fair intendment of what took place immediately thereafter was that Brown's counsel in effect, asked for the invocation of the Supreme Bench rule and that the judge, desirous of

508

preserving Brown's rights, in effect, irrespective of semantics, acceded to the request. Under that rule, the sentence was suspended, not vacated, and, unless Brown's petition for a new trial had been granted, the sentence could not thereafter be increased.

*Judgment of conviction affirmed; sentence of death stricken, and sentence of imprisonment for life reinstated.*